Fred W. RISTOW;  Susan M. Ristow,
Plaintiffs–Appellants,

v.

SOUTH CAROLINA PORTS AUTHORI-
TY, an agency of the State of South
Carolina; THE SS UNKNOWN, an un-
known ocean going ship, Defendants–
Appellees.

No. 93–1861.

United States Court of Appeals,
Fourth Circuit.

Argued March 9, 1994.

Decided June 13, 1994.

**ARGUED:** Leonard William Schulz, Big Bend, WI, for appellants.

William H. Vaughan, Jr., Vaughan & Lawrence, P.A., Charleston, SC, for appellee.

Before WILKINS, Circuit Judge, and SPROUSE and CHAPMAN, Senior Circuit Judges.

Affirmed by published opinion. Senior Judge SPROUSE wrote the opinion, in which Judge WILKINS and Senior Judge CHAPMAN joined.

## OPINION

SPROUSE, Senior Circuit Judge:

Fred W. Ristow is a long-haul truck driver. On December 20, 1988, he drove a load of steel pipes to the South Carolina State Ports Authority ("Ports Authority") terminal in Charleston, South Carolina. While Ristow was standing atop a bundle of pipes on his truck, a forklift operator employed by the Ports Authority began to lift the truck's cargo. Ristow was forced to jump from the truck and suffered serious injuries. The Ports Authority notified its insurance carrier, Lloyds of London, of the incident. The Ports Authority and Lloyds retained Carter & Co., a local insurance adjustment firm, to represent their interests. Ristow claims that an employee of Carter & Co. offered him and his wife a $75,000 settlement which they accepted, but Carter & Co. refuses to pay the $75,000.

In December 1990, Ristow and his wife brought suit in federal district court in South Carolina against the Ports Authority,[1] asserting federal jurisdiction based on diversity of citizenship and admiralty. The Ristows claimed negligence, Fred demanding compensation for his injuries and his wife alleging loss of consortium. They also sued for breach of contract in connection with the $75,000 settlement offer. With the parties' consent, this case was referred to a United States Magistrate pursuant to 28 U.S.C.A. § 636(c) (1993). After briefing and a hearing, the magistrate granted the Ports Authority's motion to dismiss the case on the ground that the Ports Authority was immune from suit under the Eleventh Amendment. The Ristows appeal.

## I

The Eleventh Amendment to the United States Constitution provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." The plain language of the amendment only provides immunity for suits against "one of the United States." Nearly fifty years ago, however, the Supreme Court stated, "[W]hen the action is in essence one for the recovery of money from the state, the state is the real, substantial party in interest and is entitled to invoke its sovereign immunity from suit even though individual officials are nominal defendants." *Ford Motor Co. v. Department of Treasury*, 323 U.S. 459, 464, 65 S.Ct. 347, 350, 89 L.Ed. 389 (1945). The Supreme Court has subsequently made clear that a suit against an entity that is an arm of the state may also be barred by the Eleventh Amendment. *See e.g., Mt. Healthy City Bd. of Educ. v. Doyle*, 429 U.S. 274, 280, 97 S.Ct. 568, 572, 50 L.Ed.2d 471 (1977).

In this case, the Ports Authority maintains that it is a state entity—more particularly, that it is the alter ego of the State of South Carolina. It claims Eleventh Amendment immunity from suit. In *Ram Ditta v. Maryland Nat'l Capital Park & Planning Comm'n*, 822 F.2d 456, 457–58 (4th Cir.1987), we set forth the following four-part, nonexclusive inquiry for determining when an entity is the alter ego of a state for Eleventh Amendment purposes: (1) whether the state treasury will be responsible for paying any judgment that might be awarded; (2) whether the entity exercises a significant

---

1. The Ristows also named the vessel the SS Unknown as a defendant in the complaint. The actual name and registry of this ship, onto which Ristow's cargo was to be loaded, were never identified, and the ship was never served notice of the suit. Accordingly, the SS Unknown was dismissed as a defendant.

degree of autonomy from the state; (3) whether it is involved with local versus statewide concerns; and (4) how the entity is treated as a matter of state law. The existence of Eleventh Amendment immunity is a question of law, and the facts to be considered in applying the *Ram Ditta* factors to the Ports Authority are undisputed. *See United States v. Parke, Davis & Co.*, 362 U.S. 29, 44, 80 S.Ct. 503, 511, 4 L.Ed.2d 505 (1960). We, therefore, consider this immunity issue *de novo.*

### A

■■■ The first *Ram Ditta* factor, the responsibility of the state treasury for the judgment, is generally the most important. This notion stems from the Supreme Court's statement in *Ford Motor Co.* that the state is the real party in interest "when the action is in essence one for the recovery of money from the state." *Ford Motor Co.*, 323 U.S. at 464, 65 S.Ct. at 350. Here, to determine whether a tort recovery from the Ports Authority would in essence be one from the state, it is important to understand the role of the state treasury in the formation and operation of the Ports Authority. The Ports Authority was created by the State of South Carolina in 1942, and the state's General Assembly appropriated $750,000 in initial capital expenditures and maintenance costs. Annual appropriations of funds continued through 1959. While the Ports Authority no longer receives direct funding for its daily operations from the state, the General Assembly continues to make annual appropriations to pay the principal and interest on the $132,000,000 in general obligation bonds issued over the years to finance capital improvements for the Ports Authority. It is clear that the Ports Authority owes its very existence and current financial position to the state's coffers.

The close relationship has extended beyond the initial formation of the Ports Authority. Under South Carolina law, "[a]ny and all net revenues or earnings not necessary or desirable for operation of [the Ports Authority's] business shall be subject to the further action of the General Assembly." S.C.Code Ann. § 54–3–1020 (Law. Co-op. 1977). Under this authority, the State of South Carolina has withdrawn over $1.5 million in funds from the Ports Authority to the state treasury since 1942. In 1992, the State entered into an agreement with BMW under which the German automaker would construct a manufacturing plant in Spartanburg County. To purchase the land and prepare the site for BMW's use, the state transferred over $40 million from its treasury to the Ports Authority so that the Ports Authority could acquire the land on behalf of the state. The state's withdrawal of excess Ports Authority funds and its commingling of state funds with those of the Ports Authority in transactions like the BMW transaction are a strong indication that the funds of the Ports Authority belong to the state and that a tort recovery out of those funds would constitute one from the state treasury.

Without denying these facts, the Ristows contend nonetheless that numerous other factors support a finding that a recovery in this case would not be paid out of the state treasury. In particular, the appellants rely on § 54–3–140(9) of the South Carolina Code which provides:

> In order to enable it to carry out the purposes of this chapter, the Authority . . . [m]ay apply for and accept loans and grants of money from any Federal agency for any and all of the purposes authorized in this chapter and expend such moneys in accordance with the directions and requirements attached thereto or imposed thereon by any such Federal agency and give such evidence of indebtedness as shall be required by any such Federal agency, *except that no indebtedness of any kind incurred or created by the Authority shall constitute an indebtedness of the State,* or any political subdivision thereof, and no such indebtedness shall be secured by the faith, credit or taxing power of the State, or any political subdivision thereof[.]

S.C.Code Ann. § 54–3–140(9) (Law. Co-op. 1977) (emphasis added). The Ristows assert that the phrase "no indebtedness of any kind" means precisely what it says: the State of South Carolina may not be held responsible for *any* debt, including money owed by the Ports Authority due to a tort recovery against it. Such an interpretation would in-

sulate the state treasury from any payment of a recovery in favor of the Ristows in this case. We are unpersuaded.

The Ristows' view of § 54–3–140(9) cannot be squared with the language and structure of the other parts of the South Carolina Code relating to the fiscal prerogatives and responsibilities of the Ports Authority. Subsection (9) solely concerns the power of the Ports Authority to borrow money from agencies of the United States government. Other statutory provisions enable the Ports Authority to incur debt generally but contain no debt insulation provisions. For example, § 54–3–140(2)[2] empowers the Ports Authority to mortgage or lease real and personal property but does not insulate the state from any indebtedness arising from such mortgages or leases, nor does it refer to § 54–3–140(9). Similarly, § 54–3–1010[3] enables the Ports Authority to issue bonds to finance its operations. No language in § 54–3–1010 shields the state from responsibility for funds owed under such debt financing, nor is there any cross-reference to § 54–3–140(9).

The Ristows also make an "insurance" argument in asserting that the first *Ram Ditta* factor compels a finding in their favor. They claim that the Ports Authority is covered by a Lloyds of London policy that is large enough to satisfy the $430,000 in damages and costs which they seek. Further, they argue, even should the policy not cover the entire tort judgment, any excess liability would be paid by the Ports Authority, not the state treasury. The Ristows point out that the South Carolina Code does not obligate the General Assembly to appropriate funds for the operation of the Ports Authority nor does it make the state explicitly responsible for judgments against the Ports Authority. The only clear source of money out of which a judgment would be paid is the revenue retained by the Ports Authority in its bank accounts, *see* S.C.Code Ann. § 54–3–1020 (Law. Co-op.1977), or funds borrowed by the Ports Authority under the authority of § 54–3–1010. This reasoning finds support in the Second Circuit's decision in *Feeney v. Port Authority Trans–Hudson Corp.*, 873 F.2d 628, 631–32 (2d Cir.1989) (absent statutory provisions committing the treasuries of New York or New Jersey to satisfy judgments against the Authority, a judgment could not lead to a depletion of state treasuries), *aff'd on other grounds,* 495 U.S. 299, 110 S.Ct. 1868, 109 L.Ed.2d 264 (1990) (assuming arguendo that Port Authority is a common agency of New York and New Jersey, it has waived its Eleventh Amendment immunity).

We find persuasive, however, the reasoning of the Third Circuit which, in considering the identical New York/New Jersey Port Authority, held that the symbiotic relationship between the states and the Port Authority Trans–Hudson Corporation supported a finding of Eleventh Amendment immunity. *Port Authority Police Benevolent Ass'n v. Port Authority of New York and New Jersey,* 819 F.2d 413 (3d Cir.), *cert. denied,* 484 U.S. 953, 108 S.Ct. 344, 98 L.Ed.2d 370 (1987). The Third Circuit found that restrictions on the use of excess revenues to purposes within the Port Authority's statutory mandate were consistent with its holding that the Authority was to be considered an arm of the states of New York and New Jersey. *Id.* The court also noted, "[T]he states provided the Authority with financial support initially, and then devised a system whereby it could become financially independent. Appellant sets much store by the financial autonomy of the Authority, arguing that the Authority [therefore] is not a state agency. The appellant is mistaken." *Id.* at 416. To the contrary, New York's and New Jersey's creation of the Authority's financial structure supported a finding that it shares the states' immunity from suit. *Id.*

We favor this broader and, we think, more practical approach of the Third Circuit over that of the Second Circuit in *Feeney,* and conclude that the first factor of the *Ram Ditta* test strongly supports recognition of Eleventh Amendment immunity. Although the South Carolina State Ports Authority now appears to be self-sufficient, it was created through the use of state funds and received annual appropriations from the Gen-

---

2. S.C.Code Ann. § 54–3–140(2) (Law. Co-op. 1977).

3. S.C.Code Ann. § 54–3–1010 (Law. Co-op. 1977).

eral Assembly throughout the early years of its existence. Its control over its revenues and borrowing power are substantially circumscribed. True, § 54–3–1020 empowers the Authority to establish bank accounts in which to deposit its funds, but that same section provides that the state is entitled to "any and all net revenues not necessary or desirable for the operation of the business. . . ." Section 54–3–1010 gives the Ports Authority the ability to issue bonds; however, such borrowing is to be used only for "the acquisition, construction, equipment, maintenance and operation of any facility, building, structure, terminal railroad or any other thing which the Authority is herein authorized to acquire, construct, equip, maintain or operate. . . ." Finally, as shown by the BMW transaction, the state has used the treasury of the Ports Authority as a conduit to accomplish the aims of the government of South Carolina.

## B

The second inquiry required by *Ram Ditta* is whether the entity "exercises a significant degree of autonomy from the state." *Id.*, 822 F.2d at 457–58. In *Ram Ditta*, the court found that the Parks Commission enjoyed considerable autonomy because it was a "body corporate," could sue and be sued in its corporate capacity, could enter into contracts and leases, was managed by a ten-member commission whose members were appointed by county governments, was represented in the proceedings by county attorneys as opposed to the Maryland Attorney General's office, and derived its operating revenues from county sources. *Id.* at 458–59.

The Ristows assert that the existence of many of these same factors in this case requires a finding that the Ports Authority is autonomous from the State of South Carolina. It possesses the powers of a body corporate, including the power to sue and be sued and to make contracts. S.C.Code Ann. § 54–3–140(1) (Law. Co-op.1977). It can purchase and rent real and personal property and may pay all costs and expenses incident to its formation and organization. S.C.Code Ann. §§ 54–3–140(2), –140(8) (Law. Co-op.

1977). Rather than participate in South Carolina's civil service system, the Ports Authority may "appoint and employ and dismiss at pleasure such employees as may be selected by the board of the Authority and fix and pay the compensation" of those employees. S.C.Code Ann. § 54–3–140(5) (Law. Co-op. 1977). The Ports Authority is represented in this case by a private law firm, not South Carolina's Attorney General's office.

The Ports Authority responds, however, that it was created as an instrumentality of the State of South Carolina, S.C.Code Ann. § 54–3–130 (Law. Co-op.1977), and is governed by a seven-member board, "appointed by the Governor, with the advice and consent of the Senate. . . ." S.C.Code Ann. · # 8E8E § 54–3–10, –20 (Law. Co-op.1977). Although it has the powers of a body corporate, the Ports Authority is unlike a traditional corporation. It has no corporate charter or shareholders, and its board of directors is appointed by public officials. Property of the Ports Authority is not subject to any state taxes or assessments. S.C.Code Ann. § 54–3–1050 (Law. Co-op.1977). Its employees are eligible for the state's employee retirement system and are subject to the state's workers' compensation plan. The Ports Authority also points out that although its general counsel's law firm was retained by its insurer to represent it in this dispute, there is an assistant State Attorney General assigned to the Ports Authority.

The power to enter into contracts, purchase property, and make unconstrained personnel decisions undoubtedly provides the Ports Authority with considerable control over its day-to-day operations. Such independence, however, does not mean that the Ports Authority is not ultimately beholden to the State of South Carolina. The Ports Authority's board of directors is appointed by the governor with confirmation by the Senate; state law provides it with immunity from property taxes; it was created to serve public ends by the state's General Assembly; and the state enjoys the power to withdraw excess Ports Authority funds for its own use. Although the considerations are certainly mixed, the balance of these factors leads to the conclusion that the Ports Authority ulti-

mately answers to the state and is not, for Eleventh Amendment purposes, an autonomous institution.

### C

Likewise, the third *Ram Ditta* factor supports a finding of Eleventh Amendment immunity from suit. Contrary to the Ristows' position, we have little trouble in concluding that the Ports Authority's functions extend beyond the localized area of the coast to affect all regions of the state. Pursuant to authority granted it under § 54–3–110,[4] the Ports Authority provides facilities to enable overland transportation of products to and from South Carolina's ports. It has such facilities in Charleston, Georgetown, Beaufort, and Spartanburg counties. The BMW transaction in Spartanburg County is additional evidence that the Ports Authority's impact can be felt in portions of the state away from the Atlantic Coast.

### D

As to the final prong of the *Ram Ditta* test, there appears to be no clear statement of South Carolina law on this issue. It is true that the Supreme Court of South Carolina in *South Carolina Farm Bureau Marketing Ass'n v. South Carolina State Ports Authority,* 278 S.C. 198, 293 S.E.2d 854 (1982), broadly treated the actions of the Ports Authority as those of the state; however, that court's unstated assumptions cannot be accepted as a definitive statement of whether South Carolina courts view the Ports Authority as the alter ego of the state. On the other hand, the Ristows are unable to point to any state case that would show that the Ports Authority is not to be considered an arm of the state. The state's view of the status of the Ports Authority is at best inconclusive.

### E

Two additional factors influence our decision. First, the federal district courts located in South Carolina have unanimously held that the Ports Authority is entitled to Eleventh Amendment immunity. *See, Coakley,* No. 2:87–1442–2 (D.S.C. July 18, 1988); *South Carolina State Ports Authority v. Seaboard Air Line R. Co.,* 124 F.Supp. 533 (E.D.S.C.1954). Second, although the Eleventh Amendment insulates the Ports Authority from suit in federal court, under the South Carolina Tort Claim Act, an agency of the state is liable in tort in the same manner and to the same extent as a private individual under like circumstances, S.C.Code Ann. § 15–78–40 (Law. Co-op. Supp.1993), and § 15–78–30 [5] defines "agency" to include any "authority" of the state. Thus, while retaining Eleventh Amendment immunity, South Carolina has provided a forum in its state courts for claims such as the Ristows'.

We conclude that the South Carolina State Ports Authority is the alter ego of the State of South Carolina and is therefore entitled to Eleventh Amendment immunity from suit.[6]

### II

■ Alternatively, the Ristows ask us to remand their case to the district court for a determination of whether they have alleged claims founded on admiralty law and whether the Ports Authority has waived its sovereign immunity by entering into this federally regulated area. In *Parden v. Terminal R. of Alabama State Docks Dept.,* 377 U.S. 184, 190, 84 S.Ct. 1207, 1211, 12 L.Ed.2d 233 (1964), *overruled by Welch v. Texas Dept. of Highways & Public Transp.,* 483 U.S. 468, 107 S.Ct. 2941, 97 L.Ed.2d 389 (1987), the Supreme Court would seem to have allowed an action against a state or the alter ego of a state based on the state's adoption and ratification of the Commerce Clause. In *Welch,* however, the Supreme Court held that "to

---

4. S.C.Code Ann. § 54–3–110 (Law. Co-op.1977).

5. S.C.Code Ann. § 15–78–30 (Law. Co-op. Supp. 1993).

6. We therefore need not address the Ristows' argument that the district court had jurisdiction

over this case based on diversity of citizenship. "Since neither a state nor its alter ego is a citizen for purposes of diversity jurisdiction, a suit between a state, or its alter ego, and a citizen of another state is not a suit between citizens of different states and diversity jurisdiction does not exist." *Harris v. Pennsylvania Turnpike Comm'n,* 410 F.2d 1332, 1333–34 n.1 (3d Cir.1969).

the extent that *Parden v. Terminal Railway* is inconsistent with the requirement that an abrogation of Eleventh Amendment immunity by Congress must be expressed in unmistakably clear language, it is overruled." *Welch,* 483 U.S. at 478, 107 S.Ct. at 2948. In footnote 8 of *Welch,* the Supreme Court went on to state that it had "no occasion to discuss the validity of the additional holding in *Parden,* that Congress has the *power* to abrogate the States' Eleventh Amendment immunity under the Commerce Clause to the extent that States are engaged in interstate commerce." *Id.* 483 U.S. at 478 n. 8, 107 S.Ct. at 2948 n. 8 (emphasis added).

The Ristows assert that Congress does indeed possess the power to abrogate Eleventh Amendment immunity and has done so in the context of admiralty law. The Supreme Court in *Welch,* however, explicitly stated that "the Court has held that the Eleventh Amendment bars suits in admiralty against the States, even though such suits are not, strictly speaking, 'suits in law or equity.'" *Id.* at 472–73, 107 S.Ct. at 2945–46. The Court went on to note: "In *Florida Dept. of State v. Treasure Salvors, Inc.,* 458 U.S. 670, 102 S.Ct. 3304, 73 L.Ed.2d 1057 (1982), eight Members of the Court agreed that the Eleventh Amendment bars suit in admiralty brought to recover damages from the State or its officials." *Id.* 483 U.S. at 473 n. 3, 107 S.Ct. at 2945 n. 3 (citations omitted). Accordingly, we conclude that a suit for money damages by the Ristows against the Ports Authority grounded in admiralty is likewise barred by the Eleventh Amendment.

### III

The decision of the magistrate judge is therefore affirmed.

*AFFIRMED.*