51 F.3d 426
 John D. GRAY, Plaintiff-Appellant,
v.
Tony LAWS, individually and officially as an Orange County
Health Department employee; Dan Reimer, individually and
officially as Orange County Health Director; Orange County
Health Department; Orange County, Defendants-Appellees.
 No. 94-1608.
 United States Court of Appeals,
Fourth Circuit.
 Argued Dec. 7, 1994.
Decided April 10, 1995.
As Amended April 24, 1995.
 
 ARGUED: Monroe Jackson Nichols, Crisp, Davis, Page, Currin & Nichols, L.L.P., Raleigh, NC, for appellant. James Redfern Morgan, Jr., Womble, Carlyle, Sandridge & Rice, P.L.L.C., Winston-Salem, NC, for appellees. ON BRIEF: Robert H. Sasser, III, Womble, Carlye, Sandridge & Rice, P.L.L.C., Winston-Salem, NC; Geoffrey E. Gledhill, Coleman, Gledhill & Hargrove, Hillsborough, NC, for appellees.
 Before HALL and LUTTIG, Circuit Judges, and CURRIE, United States District Judge for the District of South Carolina, sitting by designation.
 Affirmed in part and vacated and remanded in part, by published opinion. Judge LUTTIG wrote the opinion, in which Judge HALL and Judge CURRIE joined.
 OPINION
 LUTTIG, Circuit Judge:
 
 
 1
 Appellant, John Gray, brought this suit after being discharged from his position as a sanitarian for the Orange County Health Department (OCHD) in Orange County, North Carolina. Gray claims that his discharge violated his Due Process and First Amendment rights under the Federal Constitution and rights secured to him under the North Carolina Constitution and common law. The district court dismissed the claims against defendants Tony Laws and Dan Reimer in their official capacity, finding those claims barred from federal court review by the Eleventh Amendment. The district court also dismissed all claims against OCHD and Orange County. The district court granted summary judgment in favor of Laws and Reimer on plaintiff's claims against these defendants in their individual capacity.
 
 
 2
 We vacate the district court's Eleventh Amendment determinations and, with the exception of the due process claims, reinstate all of plaintiff's claims against Reimer and Laws in their official capacity and against OCHD and the county. We also vacate the district court's entry of summary judgment against Reimer and Laws on the First Amendment claim. We affirm summary judgment in favor of defendants in their individual capacity on all other counts, and we affirm all of the district court's judgments with respect to Gray's due process claims.
 
 I.
 
 3
 John Gray served as a sanitarian for OCHD for eighteen years. In May 1990, Dan Reimer, OCHD's director, discharged Gray from his duties. Reimer contends that he dismissed Gray because of improper sexual remarks Gray allegedly made to two women while conducting sanitation inspections of facilities in Orange County. Gray contends that Reimer and Tony Laws, Gray's immediate supervisor, fired Gray in retaliation for reporting to superiors allegations of mismanagement and arbitrary and capricious enforcement of sanitation laws by defendant Laws.
 
 
 4
 Laws and Reimer learned of the alleged sexual remarks in January 1990. After learning of the allegations, Reimer instructed Laws to conduct a preliminary investigation into the two reported incidents. Laws and Reimer interviewed the two women who complained about Gray's conduct, and on February 5, 1990, Reimer placed Gray on compulsory leave of absence with pay pending further investigation of the charges. Following Gray's suspension, the Orange County attorney, Geoff Gledhill, joined the investigation. Gledhill interviewed the complainants and witnesses to the alleged remarks and provided Reimer with a report outlining all of the interviews.
 
 
 5
 At the conclusion of the formal investigation, Reimer sent Gray a memorandum dated April 10, 1990, which detailed the specific allegations against Gray and which apprised Gray of his right to respond at a pre-dismissal conference. After receiving the memorandum, Gray's attorney took several depositions to prepare for the conference. Gray also testified in his own defense at the pre-dismissal conference. Reimer officially dismissed Gray after the conference, citing the complaints of sexual remarks as the ground for dismissal.
 
 
 6
 Before filing his federal claims, Gray challenged his dismissal under state law by filing a petition with the North Carolina Office of Administrative Hearings. A state administrative law judge (ALJ) concluded that Gray had been discharged without just cause but that Gray's procedural rights had not been violated. The ALJ determined that the complainants' allegations were "suspect" because both complainants had "on going confrontations" with Mr. Laws, as a result of sanctions he recommended against them for sanitary code violations. J.A. at 576. Even accepting the complaints as true, the ALJ did not find just cause for termination, because there were no allegations that Gray had used his position of authority over the complainants to gain sexual favors. J.A. at 577. The ALJ found that, at worst, Gray's alleged statements "indicat[ed] a lapse of judgment," which did not "justif[y] the termination of a career employee with an otherwise satisfactory record of employment." J.A. at 577. The State Personnel Commission adopted the ALJ's decision and recommended that Gray be reinstated at OCHD with back pay and attorney's fees. Reimer, who under North Carolina law has the discretion to reject the State Personnel Commission's recommendation, decided not to reinstate Gray and, on March 13, 1992, affirmed his initial discharge decision. Gray then appealed Reimer's final decision in state court, where the trial judge adopted the Personnel Commission's recommendation and ordered reinstatement, back pay, and attorney's fees. OCHD has appealed this decision.
 
 
 7
 In addition to his challenge under state law, Gray filed the federal claims at issue in this case. He sued Orange County, OCHD, and Reimer and Laws, both in their individual and official capacity, alleging violations of his federal constitutional rights to free speech and due process under 42 U.S.C. Sec. 1983, violation of state constitutional rights, intentional infliction of emotional distress, and civil conspiracy. He also charged Reimer and Orange County with negligent retention of Laws under state law.
 
 
 8
 The parties agree that the district court dismissed for lack of jurisdiction all claims against Reimer and Laws in their official capacity, and none of these claims are pending in the State of North Carolina. The district court held that in making employment decisions, local health department officials in North Carolina act on behalf of the state rather than the county, and therefore that suit against these state officials in their official capacity is barred from federal court review by the Eleventh Amendment. The court below also dismissed all claims against Orange County and OCHD, holding that Orange County could not be liable for the actions of state officers and that OCHD was not an entity capable of being sued under North Carolina law. Finally, the court granted summary judgment in favor of Reimer and Laws on all claims against them in their individual capacity.
 
 
 9
 Gray appeals the district court's determination in all respects. He maintains that OCHD is not a state agency but rather a county agency capable of being sued in federal court under section 1983. He argues further that as officers of a county agency, Reimer and Laws are county officials also suable in federal court. And because Reimer and Laws are county officials, Gray contends that the county may be held liable for their actions. Finally, Gray challenges the entry of summary judgment against him on the remainder of his claims against Reimer and Laws individually.
 
 II.
 
 10
 We first address the district court's conclusion that Reimer and Laws, as officers of OCHD, are entitled to Eleventh Amendment protection in suits against them in their official capacity.
 
 A.
 
 11
 The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. Although by its terms the Amendment applies only to suits brought against a state by "Citizens of another State," it is well established that "an unconsenting State is immune from suits brought in federal courts by her own citizens as well as by citizens of another State." Edelman v. Jordan, 415 U.S. 651, 663, 94 S.Ct. 1347, 1355, 39 L.Ed.2d 662 (1974). This immunity extends as well to state agencies and other government entities properly characterized as "arm[s] of the State." Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 280, 97 S.Ct. 568, 572, 50 L.Ed.2d 471 (1977); see also Puerto Rico Aqueduct and Sewer Auth. v. Metcalf & Eddy, Inc., --- U.S. ----, ----, 113 S.Ct. 684, 688, 121 L.Ed.2d 605 (1993) ("[A] State and its 'arms' are, in effect, immune from suit in federal court."). Like the state itself, state officers acting in their official capacity are also entitled to Eleventh Amendment protection, because "a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office," and "[a]s such, it is no different from a suit against the State itself." Will v. Michigan Dep't of State Police, 491 U.S. 58, 71, 109 S.Ct. 2304, 2312, 105 L.Ed.2d 45 (1989) (citations omitted).[1]
 
 
 12
 While states, state entities, and state officials are protected by the Eleventh Amendment, the Amendment erects no jurisdictional bar to suits against local governmental entities. See id. at 70, 109 S.Ct. at 2312 ("States are protected by the Eleventh Amendment while municipalities are not."); Lake Country Estates, Inc. v. Tahoe Regional Planning Agency, 440 U.S. 391, 401, 99 S.Ct. 1171, 1177, 59 L.Ed.2d 401 (1979) ("[T]he Court has consistently refused to construe the [Eleventh] Amendment to afford protection to political subdivisions such as counties and municipalities, even [where] such entities exercise a 'slice of state power.' "); Monell v. Department of Social Servs., 436 U.S. 658, 690 n. 54, 98 S.Ct. 2018, 2035 n. 54, 56 L.Ed.2d 611 (1978) ("[T]here [is no] basis for concluding that the Eleventh Amendment is a bar to municipal liability."). This is so, in part, because "[b]y its terms, the protection afforded ... is only available to 'one of the United States.' " Lake Country Estates, 440 U.S. at 400, 99 S.Ct. at 1177. Nor does Eleventh Amendment immunity extend to local government officials sued in their official capacity, because "[o]fficial-capacity suits ... 'generally represent only another way of pleading an action against an entity of which an officer is an agent,' " Kentucky v. Graham, 473 U.S. 159, 165, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114 (1985) (quoting Monell, 436 U.S. at 690 n. 55, 98 S.Ct. at 2035 n. 55), and in official capacity suits against local government officers, "the real party in interest," id. at 166, 105 S.Ct. at 3105, is ordinarily the local government entity itself.
 
 
 13
 It is often difficult to determine whether a government entity with both state and local characteristics constitutes an "arm of the state" for Eleventh Amendment purposes. Recently, however, in an opinion that is certain to generate confusion, the Supreme Court at least indirectly identified the general factors to be considered in making this determination. See Hess v. Port Auth. Trans-Hudson Corp., --- U.S. ----, 115 S.Ct. 394, 130 L.Ed.2d 245 (1994).[2] In Hess, the Court specifically addressed the Eleventh Amendment's application to multistate entities created under the Compact Clause, in particular the Port Authority Trans-Hudson Corporation created by New York and New Jersey and authorized by Congress. Consequently, the Court's Eleventh Amendment analysis was driven in large part by the "significantly different position in our federal system" that multistate entities occupy from the states. Id. at ----, 115 S.Ct. at 400. There is little question, however, that essentially the same broad principles identified by the Court as relevant in the multistate entity context apply also in determining whether, within a single state, a governmental entity is "state" or "local" for purposes of the Eleventh Amendment. See infra at 432.
 
 
 14
 In Hess, the Court identified as the primary "concerns ... that underpin the Eleventh Amendment," that federal court judgments not deplete state treasuries and that the sovereign "dignity" of the states be preserved. Hess, --- U.S. at ----, 115 S.Ct. at 406. The primacy of these concerns, explained the Court, is due to the historical facts that "[a]doption of the Amendment responded most immediately to the States' fears that 'federal courts would force them to pay their Revolutionary War debts, leading to their financial ruin,' " id. at ----, 115 S.Ct. at 400 (citation omitted), and that " '[t]he Amendment is rooted in a recognition that the States, although a union, maintain certain attributes of sovereignty, including sovereign immunity,' " id. (citation omitted). These two concerns, "the Eleventh Amendment's twin reasons for being," id. at ----, 115 S.Ct. at 404, the Court instructed, should dominate the inquiry in cases where it is difficult to discern whether a particular entity is an arm of the state, id. ("When indicators of immunity point in different directions, the Eleventh Amendment's twin reasons for being remain our prime guide.").
 
 
 15
 In identifying the protection of state treasuries and respect for the sovereign dignity of the states as the principal concerns underlying the Amendment, the Court rejected the dissent's position that the extent of state control over the entity should be dispositive of the immunity inquiry. The dissent would have held that "the critical inquiry" in the Eleventh Amendment context is "whether the State possesses sufficient control over an entity performing governmental functions that the entity may properly be called an extension of the State itself." Id. at ----, ----, 115 S.Ct. at 411, 410 (O'Connor, J., dissenting) (emphasis in original). The Court rejected the consideration of state control over the entity as dispositive because that consideration "does not home in on the impetus for the Eleventh Amendment: the prevention of federal court judgments that must be paid out of a State's treasury." Hess, --- U.S. at ----, 115 S.Ct. at 404. Contrary to the dissent's suggestion, however, the Court did not "dismiss[ ] consideration of control altogether" as a relevant consideration in determining immunity, id. at ----, 115 S.Ct. at 411 (O'Connor, J., dissenting); it merely held that control is not dispositive of the question, particularly when an entity has "multiple creator controllers," Hess, --- U.S. at ----, 115 S.Ct. at 404; cf. Puerto Rico Aqueduct and Sewer Auth., --- U.S. at ---- - ----, 113 S.Ct. at 687-88 ("Absent waiver, neither a State nor agencies acting under its control may 'be subject to suit in federal court.' " (citation omitted)).[3] Similarly, while the Court also consigned to lesser prominence the remaining factors that it had identified as relevant in Lake Country Estates--the state's characterization of the entity and the entity's functions--it retained these factors, as well, as relevant to the Eleventh Amendment inquiry. In fact, the Court addressed these other "indicators of immunity" in the course of its opinion. Hess, --- U.S. at ---- - ----, 115 S.Ct. at 402-04.
 
 
 16
 It is impossible to glean from the Court's opinion in Hess the precise differences between the analyses governing multistate entities and single state entities. However, we believe that the same general principles identified in that opinion must also apply in the single state context. The two fundamental principles identified by the Court are the principal rationales for the Eleventh Amendment itself, see, e.g., id. at ----, 115 S.Ct. at 404 (identifying treasury and sovereignty concerns as "the Eleventh Amendment's twin reasons for being"), and therefore they should be no less applicable in the single state context. The Court even distills these principles from cases addressing whether an entity within a single state could be characterized as an arm or alter ego of the state.[4] Similarly, we can conceive of no logical reason why the other factors recognized by the Hess Court as relevant in evaluating a multistate entity, specifically the extent of state control, state characterization of the entity, and the entity's functions, id. at ----, 115 S.Ct. at 402, would not likewise be relevant in the non-Compact Clause context. Compare id. at ---- - ----, 115 S.Ct. at 409-10 (O'Connor, J., dissenting) (noting that prudential reasons counsel against multiple factors). That the Court vacated and remanded for consideration in light of Hess our decision in Ristow v. South Carolina Ports Auth., 27 F.3d 84 (4th Cir.), vacated, --- U.S. ----, 115 S.Ct. 567, 130 L.Ed.2d 485 (1994), which addressed the immunity question for a single state entity, only reinforces our belief that Hess is instructive in the single state context.
 
 
 17
 The principal differences between the multistate and single state analyses appear to be that, in the former but not the latter, a presumption against Eleventh Amendment immunity exists, Hess, --- U.S. at ----, 115 S.Ct. at 402, there is no threat to the integrity and dignity of the states, id. at ----, 115 S.Ct. at 401, and the extent of state control over the entity is deemed to be such a "perilous inquiry" as to be largely irrelevant, id. at ----, 115 S.Ct. at 404 (citation omitted). It is presumably these analytical differences, which were necessitated by the inherent differences between multistate and single state entities, that gave rise to the Court's admonition against "amalgamat[ion] [of] Compact Clause entities with agencies of 'one of the United States' for Eleventh Amendment purposes." Id. at ----, 115 S.Ct. at 402.
 
 
 18
 While we believe, for the reasons discussed, that the Court in Hess did identify the considerations relevant even to the single state Eleventh Amendment inquiry, it did not offer any guidance as to how to apply any of the various factors in that context, or for that matter in the multistate context. For example, the Court did not suggest how the Eleventh Amendment analysis is to proceed until the time when it is apparent that the "indicators of immunity point in different directions." Id. at ----, 115 S.Ct. at 404. In particular, the Court never indicated whether the considerations of the state treasury and state sovereignty are generally dispositive if they both suggest the same conclusion, regardless of the conclusion suggested by the other factors. Similarly, although the Court identified protection of state treasuries and respect for state sovereignty as the "prime guide[s]" when the various factors are in conflict, id., it did not ascribe relative weights to these factors or explain the interrelationship of these two considerations. Finally, the Court explained neither when nor how the other "relevant considerations" factor into the central inquiry into the action's effect on the state's treasury and sovereignty.
 
 
 19
 Nevertheless, from the Court's observation in Edelman that the Eleventh Amendment bars a suit in which the judgment "must be paid from public funds in the state treasury," Edelman, 415 U.S. at 663, 94 S.Ct. at 1356, and the Court's reaffirmation in Hess that the "core" concern of the Amendment is protection of the state's treasury, Hess, --- U.S. at ----, 115 S.Ct. at 406, it appears that a determination that the state treasury will be liable for a particular judgment is largely, if not wholly, dispositive of entitlement to Eleventh Amendment immunity in the single state context, as it is in the multistate context. See id. at ----, 115 S.Ct. at 405 (citing with approval the rule applied in the majority of circuits, that the " 'state treasury factor is the most important factor to be considered ... and, in practice, ha[s] generally [been] accorded ... dispositive weight.' " (citation omitted)); id. at ----, 115 S.Ct. at 406 (describing as "correct legal theory" that payment from state treasury is most important consideration); id. at ----, 115 S.Ct. at 404 (acknowledging that "vulnerability of the State's purse" is generally considered the "most salient" factor); see also id. at ----, 115 S.Ct. at 410 (O'Connor, J., dissenting) (characterizing majority as holding that "vulnerability of the state treasury is determinative" in the Eleventh Amendment inquiry). This was essentially our holding in Bockes v. Fields, 999 F.2d 788, 790-91 (4th Cir.1993), cert. denied, --- U.S. ----, 114 S.Ct. 922, 127 L.Ed.2d 216 (1994).
 
 
 20
 If, on the other hand, the state's treasury will not be affected by a judgment in the action, then the availability of immunity for single state entities, as opposed to multistate entities, must be determined by resort to the other relevant considerations referenced by the Court, chief among which are whether the suit will jeopardize "the integrity retained by [the] State in our federal system," Hess, --- U.S. at ----, 115 S.Ct. at 400, and whether the state possesses such control over the entity claiming Eleventh Amendment immunity that it can legitimately be considered an "arm of the state."
 
 
 21
 In the end, we do not believe that Hess, as it applies to single state entities, materially altered the Eleventh Amendment analysis we formulated in Ram Ditta v. Maryland Nat'l Capital Park and Planning Comm'n, 822 F.2d 456 (4th Cir.1987), and refined in Bockes.[5] We recognized in Ram Ditta that payment of judgments from the state treasury is generally "the most important consideration" in "determining whether an entity is the alter ego of the state," id. at 457 (emphasis in original), and we held in Bockes that Eleventh Amendment immunity is warranted at least where the judgment will be paid from the state treasury, see Bockes, 999 F.2d at 790-91. Moreover, each of the other considerations enumerated in Ram Ditta was recognized in Hess as relevant to the question of Eleventh Amendment immunity. Hess necessitates a modification of our analysis for single state entities only to the extent that it must be read to introduce as one of the primary considerations the concern for state sovereignty and to formulate differently several of the other relevant considerations that we had previously enumerated.
 
 
 22
 Although the changes in our circuit's Eleventh Amendment analysis wrought by Hess arguably are not significant as they bear on the single state issue before us, neither are they inconsequential. Generally, " '[t]he District Court is in the best position to address in the first instance the competing questions of fact and state law necessary to resolve the eleventh amendment issue,' " Keller v. Prince George's County, 827 F.2d 952, 964 (4th Cir.1987) (quoting Patsy v. Board of Regents, 457 U.S. 496, 515 n. 19, 102 S.Ct. 2557, 2567 n. 19, 73 L.Ed.2d 172 (1982)). This is especially true in this case, given the barrenness of the record. Accordingly, rather than decide the Eleventh Amendment issue ourselves, we vacate and remand the district court's Eleventh Amendment holdings for that court to first consider the issue in light of this opinion and Hess. The claims against the defendants in their official capacity are therefore reinstated pending resolution of the Eleventh Amendment issue by the district court on remand.[6]B.
 
 
 23
 Because the district court will be reconsidering this case in light not only of Hess, but also our own circuit's precedent, we address as well what we believe were errors in the district court's understanding of our precedent.
 
 
 24
 In sustaining the defendants' Eleventh Amendment defenses, the district court relied primarily on our decision in Dotson v. Chester, 937 F.2d 920 (4th Cir.1991). See J.A. at 535-36. The question in Dotson, however, was not whether immunity from federal suit existed under the Eleventh Amendment, but rather whether a local government official possessed "final policymaking authority" so as to render the county liable for his conduct under 42 U.S.C. Sec. 1983. See Dotson, 937 F.2d at 924.[7] In Dotson, the "County Commissioners ha[d] not disputed on appeal the district judge's conclusion that the County was not entitled to Eleventh Amendment immunity," and, with citation to Ram Ditta and Lake Country Estates, we accepted without comment or analysis, that the district court's "denial of [Eleventh Amendment] immunity was proper." Id. at 930 n. 11. The question of the state's immunity under the Eleventh Amendment was never before us.
 
 
 25
 As a consequence of its misreading of Dotson, the district court erroneously applied in the Eleventh Amendment context principles applicable only under section 1983. First, the district court concluded that "[d]etermining whether an officer acts on behalf of the state or a county is a question of state law." J.A. at 536. While "[a] state court's view of the status of a state political entity" may be relevant "in determining whether that entity is entitled to eleventh amendment immunity," Ram Ditta, 822 F.2d at 459, " '[t]he question of whether an agency is the alter ego of the state and thereby immune from federal jurisdiction under the eleventh amendment is a question of federal, not state, law,' " id. at 458 n. 5 (citation omitted) (emphasis in original).
 
 
 26
 Second, the district court mistakenly assumed that in the Eleventh Amendment context, "[c]ourts have utilized a 'functional' analysis in determining whether an individual acts on behalf of the state or the county, noting that the same individual 'is not always a state employee or always a county employee.' " J.A. at 535 (quoting Dotson, 937 F.2d at 928). While it is true that whether a judgment against an official is payable from the state treasury on occasion may depend upon the function being performed by the official at the time of the alleged illegal conduct, the primary consideration of Eleventh Amendment immunity is whether the state is liable for the judgment against the employee, not the function performed by the employee.
 
 III.
 A.
 
 27
 Because the district court did not undertake the appropriate Eleventh Amendment analysis, it did not canvass many of the relevant state law provisions, nor did it make factual findings on many of the factors that inform the decision on the availability of Eleventh Amendment immunity. Accordingly, on remand the district court should consider the following, and any other, statutory provisions that may bear upon the considerations identified as relevant in Hess, especially that of whether a judgment against Reimer, Laws, and OCHD would be paid from the state treasury.
 
 
 28
 Section 143-300.8 of the North Carolina code expressly provides for state payment of judgments against local health department employees, in limited instances. That section provides that,
 
 
 29
 [a]ny local health department sanitarian enforcing rules of the Commission for Health Services under the supervision of the Department of Environment, Health, and Natural Resources pursuant to G.S. 130A-4(b) shall be defended by the Attorney General, subject to the provisions of G.S. 143-300.4, and shall be protected from liability in accordance with the provisions of this Article in any liability in any civil or criminal action or proceeding brought against the sanitarian in his official or individual capacity, or both, on account of an act done or omission made in the scope and course of enforcing the rules of the Commission for Health Services. The Department of Environment, Health, and Natural Resources shall pay any judgment against the sanitarian, or any settlement made on his behalf, subject to the provisions of G.S. 143-300.6.
 
 
 30
 N.C.Gen.Stat. 143-300.8.
 
 
 31
 We doubt, although we are not certain, that this provision would apply to Reimer and Laws. To begin with, Reimer, OCHD's director, and Laws, OCHD's environmental health supervisor, do not appear to qualify as "sanitarians," which term is defined for purposes of a different chapter of the code not to include "public health officer[s] [and] public health department director[s]." Id. Sec. 90A-51(4)(c). Assuming arguendo that Reimer and Laws are sanitarians under section 143-300.8, the provision only applies to local health department sanitarians who are enforcing state promulgated rules "pursuant to G.S. 130A-4(b)." Id. Sec. 143-300.8. Section 130A-4(b) provides that,
 
 
 32
 [w]hen requested by the Secretary, a local health department shall enforce the rules of the Commission under the supervision of the Department. The local health department shall utilize local staff authorized by the Department to enforce the specific rules.
 
 
 33
 Id. Sec. 130A-4(b). It appears undisputed that neither Reimer nor Laws was "enforc[ing] the rules of the Commission" pursuant to section 130A-4(b). It also appears that neither defendant engaged in an "act ... or omission made in the scope and course of enforcing the rules of the Commission of Health Services," as required by section 143-300.8. Rather, this suit arises from employment decisions made by Reimer and Laws, which seemingly have nothing to do with the activities covered by section 130A-4(b).
 
 
 34
 North Carolina's adoption of a discrete statute providing for payment of judgments against local sanitarians only in limited instances would tend to support a conclusion that in all other circumstances, state resources will not be used to cover the liability of local health department employees acting in their official capacity. If local health departments and their officials were covered generally by the state, then there would have been no need for the North Carolina legislature to adopt section 143-300.8, because sections 143-300.3 and 143-300.6 already would provide for legal defense and payment of judgments--paid for out of the state treasury--for state officials sued in their official capacity. See id. Sec. 143-300.3, Sec. 143-300.6. As there does not appear to be a statute that would authorize payment by the state of any judgment entered against OCHD and its employees, it seems more likely that official capacity suits against local health department officials will be paid out of local funds allocated for that purpose. See id. Secs. 153A-97, 160A-167.
 
 
 35
 The North Carolina Code also includes a series of provisions bearing on the question of whether OCHD is subject to local or state control. These provisions suggest that it is the counties that are largely responsible for creating and operating the local departments of health.
 
 
 36
 Section 130A-34(b) designates the county as the governmental entity that "shall operate a county health department." Id. Sec. 130A-34(b). Counties are also directed to operate a "county" board of health, which "shall be the policy-making, rule-making and adjudicatory body for [the] county health department." Id. Sec. 130A-35(a). Appointments to the county board of health are subject to local control, id. Sec. 130A-35(b), and the county board of commissioners retains the exclusive power to appoint and remove county health board members, id. Secs. 130A-35(b), 130A-35(g). The local boards of health are also given independent rulemaking authority to "protect and promote the public health." Id. Sec. 130-39(a). And the county is authorized to levy property taxes "to provide for the county's share of maintaining and administering services offered by or through the county or district health department." Id. Sec. 153A-149(c)(13). The power conferred on the local health director is also decidedly local. See id. Sec. 130A-41(c) ("Authority conferred upon a local health director may be exercised only within the county or counties comprising the local health department.").
 
 
 37
 On the other hand, local health departments do not enjoy complete independence from the state. The decision to provide health services locally is mandated by the state, id. Sec. 130A-34, and sanitarians are required to register with the State Board of Sanitarian Examiners, id. Sec. 90A-50. Nor is a local health department's rulemaking authority unbounded. In areas where a statewide health agency has adopted a rule, a local board of health may only deviate from the state rule where, "in the opinion of the local board of health, a more stringent rule is required to protect the public health." Id. Sec. 130A-39(b). It also appears that the state provides some funding for local health departments. See, e.g., id. Secs. 130A-4.1, 130A-4.2.
 
 B.
 
 38
 As the district court conducts the analysis required by Hess and our own precedents, we expect that respondents will continue to press their claim that the North Carolina intermediate appellate court's decision in EEE-ZZZ Lay Drain Co. v. North Carolina Dep't of Human Resources, 108 N.C.App. 24, 422 S.E.2d 338, 341 (1992) [hereinafter EZ Lay ]; see also Robinette v. Barriger, 116 N.C.App. 197, 447 S.E.2d 498, 502 (1994) (following EZ Lay ), mandates a conclusion that local health departments are state agencies. A state's characterization of a governmental entity under state law, as Hess confirms, is at least a subsidiary factor in the Eleventh Amendment inquiry. See also Ram Ditta, 822 F.2d at 459-60. As our decision in Ram Ditta emphasized even before Hess, however, the Eleventh Amendment question ordinarily is not resolved by resort to this subsidiary consideration:
 
 
 39
 [Q]uestions of eleventh amendment immunity are ultimately governed by federal law. The criteria established by federal law are, of course, sufficiently flexible to allow us to give deference to the rationale used by a state court in deciding questions of state sovereign immunity. Our inquiry, however, must go beyond that single factor and include all factors bearing on the federal policy entitling appropriate governmental entities to eleventh amendment immunity.
 
 
 40
 Id. at 459-60 (citation omitted). In fact, in Ram Ditta we refused to grant Eleventh Amendment immunity on the single fact that Maryland's highest court had deemed the agency in question a state agency for purposes of state sovereign immunity, where other factors "weigh[ed] heavily against eleventh amendment immunity." Id; see also Ristow, 27 F.3d at 89 (finding persuasive the fact that "the federal district courts located in South Carolina have unanimously held that the Ports Authority is entitled to Eleventh Amendment immunity").
 
 
 41
 We would caution the district court in any event against overreliance upon EZ Lay and Robinette. First, neither EZ Lay nor Robinette is a decision of North Carolina's highest court. Second, there is no reasoning provided for the EZ Lay court's conclusion. See 422 S.E.2d at 341. Rather, the court simply states that "[a]fter careful examination of the authority and duties imposed statutorily by the General Assembly upon the local health departments, we hold that they are agents of the State." Id. Robinette similarly provides no explanation for its conclusion that local health departments are state agencies. Robinette, 447 S.E.2d at 502. Finally, EZ Lay did not address the critical question of whether judgments against the local health departments would be paid from the state's coffers.
 
 
 42
 We believe that this court's decision in Avery v. County of Burke, 660 F.2d 111 (4th Cir.1981), would be more instructive than either EZ Lay or Robinette. Like Dotson, Avery concerned a section 1983, and not an Eleventh Amendment, claim, so the analysis in Avery is not directly applicable in this case. Nevertheless, in Avery we observed that in North Carolina, "the Board of Health ... is [not] a legal entity separate and apart from the county," id. at 114 (dicta ), and that the "board[ ] [is] created by, and [is an] extension[ ] of, the county," id. We also noted in Avery that if a plaintiff "is entitled to recover damages under Sec. 1983 because of the board[']s conduct, the county would be liable." Id. These observations are not specifically directed at the overriding Eleventh Amendment inquiries into the effect of judgments on the treasury and the dignity of the state. We are also aware both that Avery was decided before EZ Lay and Robinette, and that Avery did not squarely address the issue before us today. It is not insignificant, however, that we have allowed suits to proceed against North Carolina's local boards of health in federal court and that we have consistently regarded the county and the county board of health as one in the same.
 
 IV.
 
 43
 We next address Gray's section 1983 claim that Reimer and Laws, in their individual capacity, violated Gray's rights to due process under the Federal Constitution when they terminated his employment. In the face of the state ALJ's findings that Reimer and Laws properly adhered to the state's prescribed procedures for terminating employees, J.A. at 582-83, which findings in turn were adopted by the State Personnel Commission and a state trial court, J.A. at 534, Gray primarily contends that the process afforded him was constitutionally inadequate because the defendants allegedly violated state personnel regulations. However, "[a]lleged violations of due process in the deprivation of a protectable interest are to be measured against a federal standard of what process is due and that standard is not defined by state-created procedures, even when those state-created procedures exceed the amount of process otherwise guaranteed by the Constitution." Riccio v. County of Fairfax, 907 F.2d 1459, 1469 (4th Cir.1990). The Constitution's due process requirements are defined by the Constitution and do not vary from state to state on the happenstance of a particular state's procedural rules. See Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 541, 105 S.Ct. 1487, 1493, 84 L.Ed.2d 494 (1985) ("[O]nce it is determined that the Due Process Clause applies, 'the question remains what process is due.' The answer to that question is not to be found in the [state] statute." (citation omitted)). "If state law grants more procedural rights than the Constitution would otherwise require," as do the North Carolina procedures Gray claims were violated, "a state's failure to abide by that law is not a federal due process issue." Riccio, 907 F.2d at 1469.
 
 
 44
 Even assuming that Gray properly alleged a violation of due process as measured against the well-settled federal standards, and assuming that Gray possessed a property interest in his continued employment as a sanitarian, the district court's summary judgment against him still must be affirmed. A state satisfies the Constitution's due process requirement in terminating an employee by providing notice of the proposed deprivation and a pre-deprivation opportunity to respond. See Loudermill, 470 U.S. at 546, 105 S.Ct. at 1495. "[T]he pretermination 'hearing,' though necessary, need not be elaborate." Id. at 545, 105 S.Ct. at 1495. The purpose of this procedural safeguard is not to "definitively resolve the propriety of the discharge," but rather is only to provide "an initial check against mistaken decisions." Id.
 
 
 45
 Gray received far more pre-termination process than is constitutionally required. Shortly after being informed of Gray's alleged sexual misconduct in early 1990, Reimer and Laws initiated an investigation into the charges. After concluding that the charges against Gray were potentially meritorious, Reimer suspended Gray with pay pending further investigation and informed Gray of the charges that had been lodged against him. Following Gray's suspension, Reimer conducted a further investigation with the assistance of the Orange County attorney. The two officials re-interviewed the complainants and prepared a report of their findings. Reimer then sent Gray a memorandum detailing the specific allegations against him and apprising Gray of his right to respond at a pre-dismissal conference. Gray's attorney took several depositions in preparation for the conference. Only after the conference, at which Gray testified, was Gray officially terminated. Gray then availed himself of North Carolina's post-termination procedures by filing a charge with the state's Office of Administrative Hearings. To require more than this, which already exceeds the requirements of Loudermill, would "intrude to an unwarranted extent on the government's interest in quickly removing an unsatisfactory employee." Id. at 546, 105 S.Ct. at 1495.[8]
 
 
 46
 Finding that Gray suffered no due process violation at all, we affirm the district court's dismissal of the county, OCHD, and Reimer and Laws in their official capacity on the due process claim. See Los Angeles v. Heller, 475 U.S. 796, 799, 106 S.Ct. 1571, 1573, 89 L.Ed.2d 806 (1986).
 
 V.
 
 47
 Gray also challenges the district court's entry of summary judgment against him on his section 1983 claim of retaliatory discharge by Reimer and Laws in their individual capacity, in violation of the First Amendment. In his complaint, Gray alleged that the defendants intentionally and maliciously retaliated against him for "continually rais[ing] concerns with his superiors about the mismanagement and arbitrary and capricious enforcement of sanitation laws ... by Defendant Laws on behalf of the Department." J.A. at 12.
 
 
 48
 The district court entered summary judgment against Gray based on its understanding that "plaintiff [had] offer[ed] no support for these allegations in his voluminous submissions in opposition to defendants' summary judgment motion." J.A. at 544. However, Gray's deposition includes lengthy testimony about the complaints he lodged against defendant Laws' enforcement decisions. See J.A. at 185-273. Even the appellees admit as much. See Appellees' Br. at 13 ("It is true that plaintiff testified at his deposition that he made numerous complaints about defendant Laws."). The district court did properly observe "that a public employee's expression of grievances concerning his own employment is not a matter of public concern." J.A. at 545 (quoting Huang v. Board of Governors of the Univ. of North Carolina, 902 F.2d 1134, 1140 (4th Cir.1990)). However, because the district court, perhaps by oversight, failed to consider Gray's allegations of mismanagement and their possible bearing on Gray's First Amendment claim, we vacate the district court's summary judgment on this claim and remand the claim for further consideration. In doing so, we do not intend to suggest in any way that summary judgment on this claim might not yet be available.
 
 CONCLUSION
 
 49
 The district court's judgment dismissing the claims against Reimer and Laws in their official capacity is hereby vacated and remanded for a determination of whether the officials are entitled to the protection of the Eleventh Amendment. The district court's dismissal of Orange County and the OCHD is likewise vacated and remanded. And the district court's summary judgment against Gray on his section 1983 claims alleging violations of his rights under the First Amendment is also vacated.
 
 
 50
 We affirm summary judgment against Gray on his section 1983 claim alleging violations of his right to due process by Reimer and Laws individually. We also affirm the dismissal of the county, OCHD, and Reimer and Laws in their official capacity on the due process claim. We likewise affirm summary judgment against Gray on his claims that Reimer and Laws, in their individual capacity, violated Gray's state constitutional rights to freedom of speech and due process. See Corum v. University of North Carolina, 330 N.C. 761, 413 S.E.2d 276, 293, cert. denied, --- U.S. ----, 113 S.Ct. 493, 121 L.Ed.2d 431 (1992). Finally, we find no merit to Gray's remaining individual capacity claims of negligent retention, intentional infliction of emotional distress, and civil conspiracy, and affirm summary judgment against Gray on these claims.
 
 
 51
 The judgment of the district court is affirmed in part, vacated in part, and remanded for further proceedings consistent with this opinion.
 
 
 52
 AFFIRMED IN PART, VACATED AND REMANDED IN PART.
 
 
 
 [1]
 A state and its officers are not entitled to Eleventh Amendment protection, however, where a plaintiff seeks only prospective, injunctive relief. See Edelman, 415 U.S. at 664-68, 94 S.Ct. at 1356-58 (interpreting Ex Parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908)). Appellant argues that even if Reimer and Laws acted on behalf of the state, his claim can still proceed in federal court because, he contends, he is seeking prospective relief in the form of reinstatement. The district court, however, properly observed that appellant below only sought monetary relief, and that he did "not allege a claim for any type of prospective relief in his complaint." J.A. at 538. Federal court jurisdiction is therefore unavailable under Edelman and Ex Parte Young
 
 
 [2]
 Prior to Hess, we conducted a "four-part, nonexclusive inquiry [in] determining when an entity is the alter ego of a state for Eleventh Amendment purposes." Ristow v. South Carolina Ports Auth., 27 F.3d 84, 85 (4th Cir.), vacated, --- U.S. ----, 115 S.Ct. 567, 130 L.Ed.2d 485 (1994). The four factors, first identified in Ram Ditta v. Maryland Nat'l Capital Park and Planning Comm'n, 822 F.2d 456 (4th Cir.1987), were as follows: (1) "whether the state treasury will be responsible for paying any judgment that might be awarded," (2) "whether the entity exercises a significant degree of autonomy from the state," (3) "whether [the entity] is involved with local versus statewide concerns," and (4) "how [the entity] is treated as a matter of state law." Id. at 457-58
 
 
 [3]
 The Court did sound what could be understood as a note of caution with respect to the factor of state control generally, observing that "[g]auging actual control ... can be a 'perilous inquiry,' 'an uncertain and unreliable exercise,' " Hess, --- U.S. at ----, 115 S.Ct. at 404, citing a student-written law review note, see id. (quoting Note, 92 Colum.L.Rev. 1243, 1284 (1992)). However, the Court did not foreclose consideration of the extent of state control, and we believe that in many instances the degree of state control over the particular entity will be sufficiently clear to render the degree of control a substantively meaningful factor in the overall calculus. This is particularly true where the question is only whether an entity is under state or local control, and not which among a number of "multiple creator-controllers" is actually in control, as is the question with Compact Clause entities. Id
 
 
 [4]
 See Hess, --- U.S. at ----, 115 S.Ct. at 404 (citing Baxter v. Vigo County Sch. Corp., 26 F.3d 728, 732-33 (7th Cir.1994) (addressing whether local school district was a "state agency")); id. (citing Hutsell v. Sayre, 5 F.3d 996, 999 (6th Cir.1993) (addressing whether the University of Kentucky was an "arm of the state" of Kentucky), cert. denied, --- U.S. ----, 114 S.Ct. 1071, 127 L.Ed.2d 389 (1994)); id. at ---- - ----, 115 S.Ct. at 404-05 (citing Bolden v. Southeastern Pa. Transp. Auth., 953 F.2d 807, 818 (3d Cir.1991) (en banc ) (same), cert. denied, 504 U.S. 943, 112 S.Ct. 2281, 119 L.Ed.2d 206 (1992)); see also id. at ----, 115 S.Ct. at 400 (citing Puerto Rico Aqueduct and Sewer Auth., --- U.S. at ----, 113 S.Ct. at 689)
 
 
 [5]
 The analysis in Ristow also resembled that undertaken by the Court in Hess. We presume that the Court's decision to vacate Ristow, --- U.S. ----, 115 S.Ct. 567, 130 L.Ed.2d 485 (1994), had less to do with the methodological approach to the case than with our disposition in applying one of the Hess factors
 In Ristow, the state had financed the development of the South Carolina Ports Authority. We concluded that such support was sufficient to cause the state treasury consideration to weigh heavily in favor of Eleventh Amendment immunity for the Authority, even though "the South Carolina Ports Authority ... appear[ed] to be [financially] self-sufficient" at the time of the action. Ristow, 27 F.3d at 87. In Hess, the Court found the "[New York-New Jersey] Port Authority's anticipated and actual financial independence [and] its long history of paying its own way" to be a strong indicator that the bistate entity was not entitled to Eleventh Amendment immunity, Hess, --- U.S. at ----, 115 S.Ct. at 404, and contrasted that entity with "transit facilities that place heavy fiscal tolls on their founding States," id.
 
 
 [6]
 The district court dismissed the claims against Orange County on the ground that the county could not be liable for the actions of state officials. Because we vacate the district court's judgment that Reimer and Laws were acting on behalf of the state, we also vacate its judgment dismissing the county
 The district court dismissed OCHD on the ground that, under state law, OCHD is not an entity that can be sued in federal court. For the reasons discussed infra, we vacate the dismissal of OCHD so that the district court may reconsider the department's susceptibility to suit in light of our decision in Avery v. County of Burke, 660 F.2d 111, 114 (4th Cir.1981).
 We affirm, however, the district court's dismissal of the county, OCHD, and Reimer and Laws in their official capacity on the due process claim. See infra at 439.
 
 
 [7]
 The district court, like the Dotson court, also relied on Owens v. Fulton County, 877 F.2d 947 (11th Cir.1989). The question in Owens, however, like the question in Dotson, was the standard for liability under section 1983, and not the standard for entitlement to Eleventh Amendment immunity. See id. at 949-50
 
 
 [8]
 Gray also claims that Reimer and Laws were biased against him in making their termination decision. In Crocker v. Fluvanna County Bd. of Pub. Welfare, 859 F.2d 14 (4th Cir.1988), we reiterated that "[t]he pretermination hearing required by Loudermill [is] not required to be held before an impartial decision maker," id. at 17 (describing holding of Garraghty v. Jordan, 830 F.2d 1295, 1302 (4th Cir.1987) ("A predeprivation proceeding need not be a full evidentiary hearing with witnesses and a neutral decision maker so long as the employee is given an opportunity to answer the charges.")). In Boston v. Webb, 783 F.2d 1163 (4th Cir.1986), however, we recognized that while "there is a presumption that government officials can and will decide particular controversies conscientiously and fairly despite earlier involvement in their investigation," this presumption may be rebutted "by demonstrations of 'extrajudicial' bias stemming from other influences than the investigative involvement," id. at 1166; see also Morris v. City of Danville, 744 F.2d 1041, 1044 (4th Cir.1984) (same). These cases rely on the Supreme Court's observation in Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), that "an impartial decision maker is essential" for affording adequate due process, id. at 271, 90 S.Ct. at 1022
 Without attempting to resolve the seeming inconsistency between these lines of cases, we are satisfied that Reimer and Laws acted in an unbiased manner in deciding to terminate Gray.