Fred W. RISTOW; Susan M. Ristow,
Plaintiffs–Appellants,

v.

SOUTH CAROLINA PORTS AUTHORI-
TY, an Agency of the State of South
Carolina, The SS Unknown, an Un-
known Ocean Going Ship, Defendants–
Appellees.

No. 93–1861.

United States Court of Appeals,
Fourth Circuit.

Submitted Dec. 1, 1994.

Decided July 20, 1995.

Leonard William Schulz, Big Bend, WI, for
appellants. William H. Vaughan, Jr.,
Vaughan & Lawrence, P.A., Charleston, SC,
for appellees.

Before WILKINS, Circuit Judge, and
SPROUSE and CHAPMAN, Senior Circuit
Judges.

Affirmed by published opinion. Senior
Circuit Judge SPROUSE wrote the opinion,
in which Judge WILKINS and Senior Circuit
Judge CHAPMAN joined.

## OPINION

SPROUSE, Senior Circuit Judge:

On June 13, 1994, we affirmed the decision
of the United States District Court for the
District of South Carolina dismissing this
personal injury action against the South Car-
olina Ports Authority on the basis of Elev-
enth Amendment immunity. *Ristow v.
South Carolina Ports Auth.*, 27 F.3d 84 (4th
Cir.1994) (*"Ristow I "*). The Supreme Court
of the United States granted certiorari and
remanded to us for reconsideration under the
principles announced in *Hess v. Port Author-
ity Trans–Hudson*, —— U.S.——, 115 S.Ct.
394, 130 L.Ed.2d 245 (1994). We have done
so and under those principles again affirm.
The relevant facts are restated.

Fred W. Ristow is a long-haul truck driver.
On December 20, 1988, he drove a load of
steel pipes to the South Carolina State Ports
Authority ("Ports Authority") terminal in

Charleston, South Carolina. While Ristow was standing atop a bundle of pipes on his truck, a forklift operator employed by the Ports Authority began to lift the truck's cargo. Ristow was forced to jump from the truck and suffered serious injuries.

In December 1991, Ristow and his wife brought suit in federal district court in South Carolina against the Ports Authority,[1] asserting federal jurisdiction based on diversity of citizenship and admiralty. The Ristows claimed negligence, Fred demanding compensation for his injuries and his wife alleging loss of consortium. They also sued for breach of contract in connection with an alleged $75,000 settlement offer. With the parties' consent, this case was referred to a United States Magistrate pursuant to 28 U.S.C.A. § 636(c) (1993). After briefing and a hearing, the magistrate granted the Ports Authority's motion to dismiss the case on the ground that the Ports Authority was immune from suit under the Eleventh Amendment. The Ristows appeal.[2]

I

The Eleventh Amendment to the United States Constitution provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." The plain language of the amendment provides immunity only for suits against "one of the United States." Nearly fifty years ago, however, the Supreme Court stated, "[W]hen the action is in essence one for the recovery of money from the state, the state is the real, substantial party in interest

and is entitled to invoke its sovereign immunity from suit even though individual officials are nominal defendants." *Ford Motor Co. v. Department of Treasury*, 323 U.S. 459, 464, 65 S.Ct. 347, 350, 89 L.Ed. 389 (1945).

As we stated in *Ristow I*, the Supreme Court has held that a suit against an entity that is an arm of the state may also be barred by the Eleventh Amendment. *See e.g., Mt. Healthy City Bd. of Educ. v. Doyle*, 429 U.S. 274, 280, 97 S.Ct. 568, 572, 50 L.Ed.2d 471 (1977). The Ports Authority maintains that it is a state entity—more particularly, that it is the alter ego of the State of South Carolina—and claims Eleventh Amendment immunity from suit. In *Lake Country Estates, Inc. v. Tahoe Regional Planning Agency*, 440 U.S. 391, 401, 99 S.Ct. 1171, 1177, 59 L.Ed.2d 401 (1979), the Supreme Court identified six factors considered useful in determining Eleventh Amendment immunity issues: (1) the characterization of the entity by the language of its creating statutes; (2) the origin of the entity's funding; (3) whether the state is financially responsible for the liabilities and obligations incurred by the entity; (4) the source of the power to appoint the entity's officers or members; (5) whether the function performed by the entity is traditionally state or municipal; and (6) whether the entity's actions are subject to a veto by the state.[3] The Court in *Hess*, however, made it abundantly clear that one factor dominates the inquiry—whether the state treasury is "obligated" for "the losses and debts" of the entity under scrutiny. This is so because the "impetus" for the Eleventh Amendment is "the prevention of federal court judgments that must be paid out of a state's treasury." *Hess*, —— U.S. at ——, 115 S.Ct. at 404, 130 L.Ed.2d at

---

**1.** The Ristows also named the vessel the *SS Unknown* as a defendant in the complaint. The actual name and registry of this ship, onto which Ristow's cargo was to be loaded, were never identified, and the ship was never served notice of the suit. Accordingly, the *SS Unknown* was dismissed as a defendant.

**2.** *See* 28 U.S.C.A. § 636(c)(3) (1993) (authorizing direct appeals from civil judgments entered in the district court by United States Magistrates presiding with consent of the parties).

**3.** Distilling the *Lake Country Estates* criteria, this court has stated the formula as a four-part, non-exclusive inquiry: (1) whether the state treasury will be responsible for paying any judgment that might be awarded; (2) whether the entity exercises a significant degree of autonomy from the state; (3) whether it is involved with local versus statewide concerns; and (4) how the entity is treated as a matter of state law. *Ram Ditta v. Maryland Nat'l Capital Park & Planning Comm'n*, 822 F.2d 456, 457–58 (4th Cir.1987).

260.[4] The Supreme Court's *Hess* teachings, of course, guide our inquiry on this remand.[5]

In *Hess*, the Court said:

> The proper focus is not on the use of profits or surplus, but rather is on losses and debts. If the expenditures of the enterprise exceed receipts, is the State in fact obligated to bear and pay the resulting indebtedness of the enterprise? When the answer is "No"—*both legally and practically*—then the Eleventh Amendment's core concern is not implicated.

*Hess,* —— U.S. at ——, 115 S.Ct. at 406, 130 L.Ed.2d at 262 (emphasis added). The dissent characterized the majority's opinion as holding "[i]f a State does not fund judgments against an entity, that entity is not within the ambit of the Eleventh Amendment, and suits in federal court may proceed unimpeded." *Hess,* —— U.S. at ——, 115 S.Ct. at 408; 130 L.Ed.2d at 265.[6]

If the *Hess* test were as sharply delineated as its dissenting opinion suggests, our resolution of the immunity issue would be simple. We find nothing in the South Carolina statutes or case law imposing liability per se on the state for judgments against its Ports Authority. The South Carolina Code does not obligate the General Assembly to appropriate funds for the operation of the Ports Authority nor does it make the state explicitly responsible for judgments against the Ports Authority. The only clear source of money from which a judgment would legally be required to be paid is the revenue retained by the Ports Authority in its bank accounts, *see* S.C.Code Ann. §§ 54–3–1020 (Law. Co-op.1977), or funds borrowed by the Ports Authority under the authority of § 54–3–1010.

As we understand the *Hess* majority opinion, however, the inquiry it compels is somewhat broader than suggested by the dissent. The majority, in the language quoted above, requires us to employ not only a legal test, but a practical analysis. Considering the practical effect of a putative Ristow judgment on the state treasury sways us to conclude that the Ports Authority, from an Eleventh Amendment perspective, is the alter ego of the State of South Carolina.

The South Carolina legislature created the Ports Authority in 1942 and heavily supported it through direct annual appropriations through 1959. While, as *Hess* makes clear, initial funding carries minimal weight in the controlling Eleventh Amendment equation, this is the first frame of a continuing picture that shows the state immersing itself in the pecuniary affairs of the Ports Authority. Periodically since 1959, South Carolina has decided that extensive capital improvements were necessary to maintain the Ports Authority as a viable player in national and international trade. It has authorized and issued several series of general obligation bonds totalling $132 million for that purpose, including $32 million issued during the pendency of this action. The

---

**4.** Before *Hess*, this court had already identified the state treasury factor as the most important consideration. *Ram Ditta*, 822 F.2d at 457. With the exception of the Court's renewed emphasis on state sovereignty, "we do not believe that *Hess* ... materially altered the Eleventh Amendment analysis we formulated in *Ram Ditta*." *Gray v. Laws*, 51 F.3d 426, 434 (4th Cir. 1995). Because our decision in this case turns on the *Hess* Court's guidance in applying the treasury factor, we will not attempt to interpret the Court's language concerning state sovereignty and dignity. Certainly, we do not intend to say anything different on this point than the careful discussion provided in *Gray*, 51 F.3d at 431–34.

**5.** In *Hess*, the Court analyzed a multistate entity created by the states of New York and New Jersey with the consent of the United States Congress. The *Hess* majority cited the entity's multistate character as a significant factor militating against a finding of Eleventh Amendment immunity. The Ports Authority urges us to hold that *Hess* has no application to an entity, like itself, created by a single state. To that, we need only reiterate our recent rejection of that reasoning. *Gray*, 51 F.3d at 432–33.

**6.** While there may be a superficial difference in the language in which the definitive principle is couched in the majority and dissenting opinions, in our view there is not a principled difference in meaning. The dissent characterizes the majority's holding as requiring a finding that a state would fund *judgments* against an entity. The majority speaks in terms of obligations "to bear and pay the resulting *indebtedness*" (emphasis added). Phenomenally, we think this language is parallel. Before an indebtedness rises to the status of an obligation, it, of course, must be reduced to a judgment.

resulting funds were deposited in the Ports Authority's account. All of the indebtedness, however, both principal and interest, is repaid out of South Carolina's general tax revenues.

Conversely, South Carolina has withdrawn over $1.5 million from the Ports Authority during its lifetime. It has done so under South Carolina law that provides, "[a]ny and all net revenues or earnings not necessary or desirable for operation of [the Ports Authority's] business shall be held subject to the further action of the General Assembly." S.C.Code Ann. § 54-3-1020 (Law. Co-op.1977). Thus, the Ports Authority is not legislatively structured to retain unlimited profits or surplus. Rather, it is the South Carolina General Assembly that has the power to determine the Ports Authority balance available to meet operational costs, presumably including funds necessary to pay putative judgments against it. On the other hand, the state has shown its willingness to contribute to the maintenance and expansion of the Ports Authority, as evidenced by the $132 million in capital improvements paid ultimately from the state treasury.[7]

■ All of this convinces us that, unlike Port Authority Trans–Hudson, the entity considered in *Hess*, the Ports Authority is not self-sufficient.[8] It is true that a judg-

ment against the Ports Authority cannot be legally enforced against the state. The practical effect of South Carolina's treatment of the fiscal affairs of the Ports Authority, however, definitively implicates the state treasury. Obviously, the legislature will not be able to withdraw net revenues "not necessary or desirable for operation" if the Ports Authority's operational funds have been depleted by judgments against it.[9] Likewise, to the extent that a judgment would deplete its resources, the Ports Authority would be unable to utilize earnings for necessary capital improvements, and so would continue to depend on the state treasury for these required expenditures. To deny Eleventh Amendment immunity in these circumstances would ignore economic reality.

To summarize, in the strictest sense there is no legal obligation by the State of South Carolina to cover the Ports Authority's debts. The state, however, provides whatever economic support is necessary over and above the Port Authority's net revenues to insure its continued vitality. Conversely, it takes back any portion of the Authority's net revenues, which, in its legislative judgment, is "not necessary or desirable" for the Ports Authority's operation. Practically, then, a judgment against the Ports Authority involves the "core concern" of the Eleventh Amendment—the ebb and flow of funds into

---

7. Another example of the state's heavy financial involvement with the Ports Authority is the implementation of an agreement between South Carolina and the German automaker BMW in 1992. BMW agreed to construct a manufacturing plant in Spartanburg County. To purchase the land and prepare the site for BMW's use, the state transferred over $40 million from its treasury to the Ports Authority so that the Ports Authority could acquire the land on behalf of the state.

8. It would be difficult to overstate the Court's reliance on the self-sufficiency of the Port Authority Trans–Hudson. *See Hess*, —— U.S. at ——, 115 S.Ct. at 405, 130 L.Ed.2d at 261 (citing the Port Authority's "actual financial independence—its long history of paying its own way"); *id.* at ——, 115 S.Ct. at 403, 130 L.Ed.2d at 259 ("for decades [the Authority] has received no money from the States"); *id.* at ——, 115 S.Ct. at 406 n. 21, 130 L.Ed.2d at 262 n. 21 (declining "to spread an Eleventh Amendment cover over an agency that consumes no state revenues"); *id.* at ——, 115 S.Ct. at 406, 130 L.Ed.2d at 263

("[T]he Port Authority is financially self-sufficient; it generates its own revenues, and it pays its own debts.").

9. We, of course, are cognizant of the Supreme Court's admonition that "[t]he proper focus is not on the use of profits or surplus, but rather is on losses and debts." *Hess*, at ——, 115 S.Ct. at 406, 130 L.Ed.2d at 262. In *Hess*, the Port Authority devoted some of its surplus to finance certain public projects that would otherwise be funded by its member states. Here, the facts are significantly different. Rather than having surplus allotted to specific projects, the Ports Authority surplus is subject to the unfettered discretion of the South Carolina General Assembly, buttressing our conclusion that such "surplus" was effectively the state's in the first instance. This conclusion is also grounded on the fact that this money is a surplus only in a semantic sense. The state has effectively contributed $132 million to the Ports Authority for capital improvement. Regardless of the technicalities of accounting, for Eleventh Amendment purposes this appears to us to mean that the Authority operates at a loss.

and out of South Carolina's treasury. We, therefore, conclude that the South Carolina State Ports Authority is entitled to Eleventh Amendment immunity from suit.[10]

## II

Alternatively, the Ristows ask us to remand their case to the district court for a determination of whether they have alleged claims founded on admiralty law and whether the Ports Authority has waived its sovereign immunity by entering into this federally regulated area. *See Parden v. Terminal Ry.*, 377 U.S. 184, 190, 84 S.Ct. 1207, 1211, 12 L.Ed.2d 233 (1964), *overruled by Welch v. Texas Dep't of Highways & Public Transp.*, 483 U.S. 468, 107 S.Ct. 2941, 97 L.Ed.2d 389 (1987). They assert that Congress possesses the power to abrogate Eleventh Amendment immunity and has done so in the context of admiralty law. The Supreme Court in *Welch*, however, explicitly stated that "the Court has held that the [Eleventh] Amendment bars suits in admiralty against the States, even though such suits are not, strictly speaking, 'suits in law or equity.'" *Id.* at 472–73, 107 S.Ct. at 2945. The Court went on to note: "In *Florida Dep't of State v. Treasure Salvors, Inc.*, 458 U.S. 670, 102 S.Ct. 3304, 73 L.Ed.2d 1057 (1982), eight Members of the Court agreed that the Eleventh Amendment bars suit in admiralty brought to recover damages from the State or its officials." *Id.* at 473 n.3, 107 S.Ct. at 2945 n.3 (citations omitted). Accordingly, we conclude that a suit for money damages by the Ristows against the Ports Authority grounded in admiralty is likewise barred by the Eleventh Amendment.

## III

The decision of the magistrate judge is, therefore, affirmed.

*AFFIRMED.*

---

**10.** In our view, *Hess*, despite emphasizing the "state treasury" factor as critical, left standing the other *Lake Country* factors where the "state treasury" issue presents a close question. *See Gray v. Laws*, 51 F.3d 426, 432 (4th Cir.1995) (despite consigning remaining *Lake Country* fac-

tors to lesser prominence, *Hess* retained them as relevant). We think consideration of the "core" issue here alone mandates the result we have reached, but, to the extent the other *Lake Country* factors apply, they, on balance, counsel in favor of immunity for the Ports Authority.