304 Ga. 667
FINAL COPY

S17G1951. GEORGIA PORTS AUTHORITY v. LAWYER.

BLACKWELL, Justice.

We granted a petition for a writ of certiorari in this case to reconsider Hines v. Georgia Ports Authority, 278 Ga. 631 (604 SE2d 189) (2004), and more specifically, its holding that the Georgia Ports Authority is not an "arm of the state" and has, therefore, no sovereign immunity from a lawsuit in a state court to recover damages under federal maritime law for the tort of a Ports Authority employee. There are several reasons to doubt the soundness of Hines. Most significantly, our decision in Hines was based on an undeveloped factual record, and now having reexamined Hines in the light of the more fully developed record in this case, we can see that Hines failed to accurately assess the relationship between the Ports Authority and the State. We overrule Hines, and we conclude today that the Ports Authority is an "arm of the state" and has sovereign immunity from lawsuits to recover damages under federal maritime law for the torts of its employees.

1. To begin, it is helpful to recount our decision in Hines, which framed the decisions of the trial court and the Court of Appeals in this case. In Hines, a longshoreman was injured while working aboard a docked vessel, allegedly as a result of the negligence of an employee of the Ports Authority. He sued the Ports Authority in the Superior Court of Chatham County to recover damages for his injuries under federal maritime law, and the Ports Authority filed a motion to dismiss on the ground of sovereign immunity. See Hines, 278 Ga. at 631. The trial court denied that motion, the Ports Authority took an interlocutory appeal, and the Court of Appeals reversed. The Court of Appeals reasoned that the sovereign immunity reserved to the State and its departments and agencies under the Georgia Constitution[1] does not bar a lawsuit to recover damages under federal maritime law, see Georgia Ports Authority v. Andre Rickmers Schiffsbeteiligungsges MBH & Co., 262 Ga. App. 591, 593 (1) (585 SE2d 883) (2003), but the Ports Authority nevertheless enjoys sovereign immunity from

---

[1] See Ga. Const. of 1983, Art. I, Sec. II, Par. IX (e) ("[S]overeign immunity extends to the state and all of its departments and agencies. The sovereign immunity of the state and its departments and agencies can only be waived by an Act of the General Assembly which specifically provides that sovereign immunity is thereby waived and the extent of such waiver.").

such a lawsuit under the Eleventh Amendment.[2] See id. at 594 (2). The longshoreman-plaintiff then filed a petition for a writ of certiorari, which this Court granted.

We ultimately rejected the claim of sovereign immunity. To begin, we acknowledged that sovereign immunity extends generally to the Ports Authority. See Hines, 278 Ga. at 632. We characterized the sovereign immunity reserved under the Georgia Constitution, however, as only a "state-conferred immunity," and citing Workman v. Mayor of New York City, 179 U. S. 552 (21 SCt 212, 45 LE 314) (1900), we held that "state-conferred immunity is preempted by [federal maritime] law." Id. (citations omitted). We next considered whether the Ports Authority enjoys "Eleventh Amendment immunity," explaining that "Eleventh Amendment immunity, unlike state-conferred immunity, does apply to admiralty and maritime claims." Id. at 633 (citation omitted). We said that "the Eleventh Amendment . . . protects states and arms of the state from private suits brought in their own courts by any person," but it does not "protect 'lesser entities' that are not 'an arm of the state.'" Id. (citations omitted). To decide

_____

[2] See U. S. Const., amend. XI ("The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.").

whether the Ports Authority is an "arm of the state" or a mere "lesser entit[y]" for purposes of the Eleventh Amendment, we adopted a standard that requires consideration of three factors: "(1) how state law defines the entity; (2) what degree of control the state maintains over the entity; and (3) from where the entity derives its funds and who is responsible for satisfying the judgments against the entity." Id. at 634 (citing Vierling v. Celebrity Cruises, Inc., 339 F3d 1309, 1314 (11th Cir. 2003)). Of these factors, we said, the last one is the most important. See id.

Applying this standard, we started with the final factor. About the financial interconnectedness of the State and the Ports Authority, we found:

> The Ports Authority may raise its own revenue by issuing bonds. Its bonds are not a debt of, nor a pledge of the faith and credit of, the state, and are repayable only from Ports Authority earnings. It may borrow money and acquire property in its own name. Although the Governor may make available to the Ports Authority funds appropriated for the construction of port facilities, the General Assembly is not required to appropriate any funds to satisfy Ports Authority debts or ongoing operations. The Ports Authority must set fees and rentals for services and facilities so that the Ports Authority is financially self-sufficient. . . . Finally, the profits of the Ports Authority are held in trust and can only be used for purposes set forth in the statutes establishing the Ports Authority.

4

Hines, 278 Ga. at 634-635 (citations omitted). Based on these findings, we concluded that "the record in this case indicates that the Ports Authority is self-sufficient and is not intertwined with the State's treasury," and this factor, therefore, "suggests that the Ports Authority is not an arm of the state for Eleventh Amendment purposes." Id. at 636.

Turning to the other factors — the way in which state law defines the Ports Authority and the extent to which the State controls it — we characterized those factors as "mixed." Hines, 278 Ga. at 636. We explained:

> The state law defining the Ports Authority is somewhat contradictory: on the one hand, the Ports Authority is a "body corporate and politic," and a "public corporation" rather than a part of any existing state agency. On the other hand, the Ports Authority is performing an essential governmental function. . . . Facts showing State control over the Ports Authority include the power of the [G]overnor to appoint members of the Ports Authority board, the requirement of State approval for the purchase or sale of real property, and the exemption of Ports Authority property and income from taxation. Facts demonstrating lesser State control include fixed terms for board members, Ports Authority control over its chair, vice-chair and the establishment of its own rules and regulations, the authority to enter construction contracts without taking competitive bids, and a lack of supervisory control over the daily operations of the Ports Authority. Additionally, unlike many state authorities, the [Ports] Authority is not assigned to any executive department for administrative purposes and is not required to have its books inspected by the State auditor. Finally, the Ports Authority

5

> may make contracts with the [S]tate and may sue the State to enforce contracts made between the State and the Ports Authority.

Id. at 636-637 (citations and punctuation omitted). Notwithstanding our characterization of these factors as "mixed," we concluded that both factors "tend to weigh towards a finding of no immunity." Id. at 636.

In the end, we concluded that "the Ports Authority is not an arm of the State" for Eleventh Amendment purposes. Hines, 278 Ga. at 637. We cautioned, however, that the factual record upon which our conclusion was based was an undeveloped one, noting that the Ports Authority in Hines had elected to proceed upon a motion to dismiss without the benefit of "an evidentiary record." Id. at 636 n.32. In particular, we observed that "[a]n analysis of the Ports Authority budget would be most useful in determining whether it was dependent upon the State," but the undeveloped record did not permit such an analysis. Id. With Hines in mind, we turn now to the facts of this case and the proceedings below.

2. Bruce Lawyer was seriously injured while working as a longshoreman aboard a vessel docked at the Port of Savannah, and in February 2013, he filed a lawsuit in the State Court of Chatham County against the Ports Authority,

seeking to recover damages for his injuries. In his pleadings, Lawyer alleged that the negligence of a crane operator employed by the Ports Authority had caused his injuries, and he asserted a claim against the Ports Authority for negligence under federal maritime law. In response to the lawsuit, the Ports Authority invoked the doctrine of sovereign immunity. The Ports Authority conceded that the Tort Claims Act[3] waives sovereign immunity for claims to recover damages for the tort of a state employee up to $1 million,[4] but it urged that sovereign immunity bars any claim to recover damages in excess of that amount. To that end, the Ports Authority filed a motion to dismiss the lawsuit to the extent that Lawyer sought to recover damages in excess of $1 million. The trial court deferred ruling on the motion until after trial,[5] and in April 2016, the

---

[3] See OCGA § 50-21-20 et seq.

[4] See OCGA § 50-21-29 (b) (1) ("[I]n any action or claim for damages brought under the provisions of [the Tort Claims Act], no person shall recover a sum exceeding $1 million because of loss arising from a single occurrence . . . ."). See also OCGA § 50-21-23 (a) ("The state waives its sovereign immunity for the torts of state officers and employees while acting within the scope of their official duties or employment and shall be liable for such torts in the same manner as a private individual or entity would be liable under like circumstances; provided, however, that the state's sovereign immunity is waived subject to all exceptions and limitations set forth in [other provisions of the Tort Claims Act].").

[5] Recognizing that it indisputably had jurisdiction to entertain a claim against the Ports Authority for damages up to $1 million, the trial court reasoned that a verdict for the Ports Authority   or a verdict against the Ports Authority but for no more than $1 million would render it unnecessary for the court to decide the question of sovereign immunity.

7

case was tried by a Chatham County jury. The jury returned a verdict in favor of Lawyer and against the Ports Authority, awarding $4.5 million in damages.

Following the verdict, the trial court took up the motion to dismiss, receiving evidence and additional briefing on the question of sovereign immunity. Consistent with our decision in Hines, the trial court framed the question as one that turns upon whether the Ports Authority is an "arm of the state," and to assess whether the Ports Authority is properly characterized as an "arm of the state," the trial court looked to the three factors that we identified in Hines — the way in which state law defines the Ports Authority, the extent to which the State controls the Ports Authority, and the extent to which the Ports Authority is financially dependent upon the State. The trial court noted that the Ports Authority in this case presented evidence that went well beyond the undeveloped factual record in Hines, and based on that evidence, the trial court made findings of fact that, it acknowledged, point to a conclusion at odds with Hines. In particular, the trial court found from the evidence in this case that the Ports Authority depends on State financing of its capital improvements, and the State exercises an "exacting level of control" over the Ports Authority. Even so, the trial court reasoned that any reconsideration of Hines was a matter for the

8

appellate courts, and as a trial court, it had no choice but to follow <u>Hines</u>.

Accordingly, the trial court denied the motion to dismiss and entered a judgment against the Ports Authority for damages in the amount of $4.5 million.

The Ports Authority appealed, continuing to argue that sovereign immunity bars any claim against it for damages in excess of $1 million. In <u>Georgia Ports Authority v. Lawyer</u>, 342 Ga. App. 161 (803 SE2d 94) (2017), the Court of Appeals affirmed, relying exclusively upon our decision in <u>Hines</u>:

> [T]he [Ports Authority] filed a significant amount of documentary and testimonial evidence to demonstrate its argument that under the three-part test adopted in <u>Hines</u>, the [Ports Authority] is an instrumentality of the State of Georgia [for immunity purposes]. On appeal, therefore, the [Ports Authority] asserts that the holding in <u>Hines</u> should be reconsidered in light of the evidentiary record in this case. Regardless of the merits of the [Ports Authority's] arguments on this issue, however, we are not at liberty to reconsider <u>Hines</u>, as this [c]ourt has no authority to overrule or modify a decision made by the Supreme Court of Georgia. Accordingly, because we are bound by the Supreme Court of Georgia's holding [in <u>Hines</u>] that the [Ports Authority] is not entitled to immunity . . . we affirm the trial court's denial of the [Ports Authority's] motion to dismiss Lawyer's maritime claim [for damages in excess of $1 million].

342 Ga. App. at 163-164 (1) (citations and punctuation omitted). The Ports Authority then filed a petition for a writ of certiorari, which we granted.

3. Our decision in <u>Hines</u> squarely resolves the question presented in this case, but as we noted in the beginning, we granted the petition for a writ of certiorari to reconsider <u>Hines</u>. There are, as we said, several reasons to doubt the soundness of <u>Hines</u>. This Court started in <u>Hines</u> with the proposition that the sovereign immunity reserved to the State and its departments and agencies under the Georgia Constitution extends to the Ports Authority, see <u>Hines</u>, 278 Ga. at 632, and no party to this case disputes that proposition. Indeed, even before our decision in <u>Hines</u>, it was settled that sovereign immunity generally extends to the Ports Authority. See <u>Miller v. Georgia Ports Authority</u>, 266 Ga. 586, 587 (470 SE2d 426) (1996) ("[T]he Georgia Ports Authority is a state agency entitled to sovereign immunity.").

But we then said that federal maritime law abrogates the sovereign immunity reserved to the State under the Georgia Constitution when a lawsuit to recover damages under maritime law is brought against the State in a state court. As support for this proposition, we pointed to <u>Workman</u>, but <u>Workman</u> cannot sustain it. The sovereign immunity reserved under the Georgia Constitution is jurisdictional in nature, see <u>McConnell v. Dept. of Labor</u>, 302 Ga. 18, 18 (805 SE2d 79) (2017), and as the United States Supreme Court

10

explained in Ex parte New York, 256 U. S. 490 (41 SCt 588, 65 LE 1057) (1921), Workman does not address sovereign immunity of a jurisdictional nature:

> [Workman] dealt with a question of the substantive law of admiralty, not the power to exercise jurisdiction over the person of [the] defendant; and in the opinion the court was careful to distinguish between the immunity from jurisdiction attributable to a sovereign upon grounds of policy, and immunity from liability in a particular case.

256 U. S. at 499. See also Workman, 179 U. S. at 566 ("The contention is, although the corporation had *general capacity to stand in judgment*, and was therefore *subject to the process of a court of admiralty*, nevertheless the admiralty court would afford no redress against the city for the tort complained of [under local law]. But the maritime law affords no justification for this contention, and no example is found in such law, where one who is *subject to suit and amenable to process* is allowed to escape liability for the commission of a maritime tort, upon the theory relied upon." (Emphasis supplied)).

Moreover, Workman involved a lawsuit in *federal court* against a *municipality*. Even to the extent that the amenability of a creature of a state to suit in federal court suggests that it must also be amenable to suit in state court,

11

it is a leap to conclude that the Ports Authority is to be treated in the same way as a municipality. Indeed, as Hines properly recognized in its subsequent discussion of "Eleventh Amendment immunity," the United States Supreme Court has long distinguished states and arms of the state, which generally enjoy immunity from suit in federal court under the Eleventh Amendment, from counties and municipalities, which do not. See Northern Ins. Co. of N.Y. v. Chatham County, 547 U. S. 189, 193 (II) (126 SCt 1689, 164 LE2d 367) (2006). Workman simply does not resolve whether the sovereign immunity reserved to the Ports Authority under the Georgia Constitution is abrogated by federal maritime law when a lawsuit to recover damages under maritime law is brought against the Ports Authority in a state court.

The question of abrogation is resolved in part, however, by Alden v. Maine, 527 U. S. 706 (119 SCt 2240, 144 LE2d 636) (1999). In Alden, the United States Supreme Court explained that the states "retain a residuary and inviolable sovereignty," id. at 715 (I) (A), and the immunity of a state from suit without its consent was regarded by the Founding generation as a fundamental aspect of that sovereignty. See id. at 715-719 (I) (B). As originally adopted, the United States Constitution preserved that fundamental aspect of the sovereignty

12

of the states in two ways. First, it withheld from Congress any power to abrogate the sovereign immunity that the states already enjoyed from suit in their own courts without their consent. See id. at 712 ("[T]he powers delegated to Congress under Article I of the United States Constitution do not include the power to subject nonconsenting States to private suits for damages in state courts."). Second, it excluded from the "Judicial power of the United States" — the provision of Article III that marks the outer limits of the jurisdiction of the federal courts — suits against nonconsenting states, an exclusion that subsequently was confirmed by the ratification of the Eleventh Amendment. See id. at 722-723 (I) (B).

The Supreme Court said in Alden that the original Constitution limits the extent to which the sovereign immunity of the states and their instrumentalities from suit in their own courts is susceptible of abrogation by federal law at least to the same extent that nonconsenting states and state instrumentalities could be made amenable to suit in the federal courts consistent with the Eleventh Amendment:

> The Supremacy Clause does impose specific obligations on state judges. There can be no serious contention, however, that the Supremacy Clause imposes greater obligations on state-court judges

13

than on the Judiciary of the United States itself. The text of Article III, § 1, which extends federal judicial power to enumerated classes of suits but grants Congress discretion whether to establish inferior federal courts, does give strong support to the inference that state courts may be opened to suits falling within the federal judicial power. The Article in no way suggests, however, that state courts may be required to assume jurisdiction that could not be vested in the federal courts and forms no part of the judicial power of the United States.

We have recognized that Congress may require state courts to hear only matters appropriate for the judicial power. Our sovereign immunity precedents establish that suits against nonconsenting States are not properly susceptible of litigation in courts, and, as a result, that the entire judicial power granted by the Constitution does not embrace authority to entertain such suits in the absence of the State's consent. We are aware of no constitutional precept that would admit of a congressional power to require state courts to entertain federal suits which are not within the judicial power of the United States and could not be heard in federal courts.

Id. at 753-754 (II) (B) (4) (citations and punctuation omitted). As we understand Alden, it holds that, if a state instrumentality enjoys immunity from suit in the federal courts under the Eleventh Amendment, its sovereign immunity from suits in the courts of its own state is inviolable and cannot be abrogated by federal law, at least to the extent that the federal law is enacted pursuant to Article I of the Constitution.[6]

_____

[6] In Alden, the Supreme Court noted that the adoption of the Fourteenth Amendment "required the States to surrender a portion of the sovereignty that had been preserved to them by the original Constitution, so that Congress may authorize private suits against

14

Under the Eleventh Amendment, the states and arms of the state are immune from suit in the federal courts without their consent, but that immunity does not extend to lesser entities, such as counties and municipalities. See Northern Ins. Co., 547 U. S. at 193 (II). See also Alden, 527 U. S. at 756 (III). States and arms of the state enjoy this immunity even in cases arising under federal maritime law. See Northern Ins. Co., 547 U. S. at 193 (II). See also Ex parte New York, 256 U. S. at 497. Whether the Ports Authority enjoys immunity under the Eleventh Amendment turns upon whether it properly is characterized as an "arm of the state," and under Alden, if it enjoys immunity from suit in the federal courts under the Eleventh Amendment, federal maritime law cannot abrogate the sovereign immunity that it enjoys from suit in the state courts. The dispositive question then is whether the Ports Authority is an "arm of the state."

In Hines, we arrived at the same question, although we came to it by faulty reasoning. Following our misplaced citation of Workman for the proposition that federal maritime law abrogates the sovereign immunity reserved to the State and its departments and agencies under the Georgia Constitution, we inquired

nonconsenting States pursuant to its § 5 enforcement power." 527 U. S. at 756 (III). Federal maritime law, however, is not an exercise of congressional enforcement power under the Fourteenth Amendment.

15

whether the Ports Authority nevertheless enjoys "Eleventh Amendment immunity," citing <u>Alden</u> for the additional proposition that "the Eleventh Amendment also protects states and arms of the state from private suits brought in their own courts by any person." <u>Hines</u>, 278 Ga. at 633. To the contrary, <u>Alden</u> teaches that the Eleventh Amendment is concerned with the extent to which states and arms of the state can be subjected to suit in the *federal courts.* See <u>Alden</u>, 527 U. S. at 735-736 (II) (A) (2). The scope of Eleventh Amendment immunity was relevant in <u>Hines</u> — and is relevant in this case — but not because the Eleventh Amendment confers immunity from suit in state courts. Sovereign immunity from suit in state courts preexisted the United States Constitution (and the Eleventh Amendment) and is inherent in the very nature of the sovereignty retained by the states and recognized by the Constitution. Id. at 741-743 (II) (B) (1). The Eleventh Amendment is only relevant because sovereign immunity from suit in state court cannot be abrogated by federal law to a greater extent than state instrumentalities can be brought within the jurisdiction of the federal courts without consent consistent with the Eleventh Amendment.

Hines nevertheless ultimately posed the right question — whether the Ports Authority is an "arm of the state" for purposes of the Eleventh Amendment. To answer that question, Hines adopted the standard articulated by the United States Court of Appeals for the Eleventh Circuit in Vierling, 339 F3d 1309, a standard that requires a consideration of three factors — the way in which state law defines the state instrumentality in question, the extent to which the State controls the instrumentality, and the extent to which the instrumentality is financially dependent on the State. See Hines, 278 Ga. at 633-634. We do not quarrel with that standard, which seems generally consistent with the decisions of the United States Supreme Court, see, e.g., Mt. Healthy City School Dist. Bd. of Ed. v. Doyle, 429 U. S. 274, 280 (III) (97 SCt 568, 50 LE2d 471) (1977), as well as the standards articulated by many other federal circuit courts. See, e.g., United States v. Univ. of Mass., Worcester, 812 F3d 35, 40 (1st Cir. 2016); Town of Smyrna, Tenn. v. Municipal Gas Authority of Ga., 723 F3d 640, 650-651 (III) (C) (6th Cir. 2013); Tucker v. Williams, 682 F3d 654, 659 (II) (7th Cir. 2012); Kitchen v. Upshaw, 286 F3d 179, 183-184 (III) (4th Cir. 2002); Carter v. City of Philadelphia, 181 F3d 339, 347 (III) (3rd Cir. 1999); Elam Constr., Inc.

17

v. Regional Transp. Dist., 129 F3d 1343, 1345 (10th Cir. 1997). Our application of that standard in Hines, however, raises serious concerns.

In the first place, we said in Hines that the last of the three factors — the extent to which the instrumentality is financially dependent on the State — is the most important because, if the State is not obligated legally or practically to pay the indebtedness of the instrumentality, "the Eleventh Amendment's core concern is not implicated." Hines, 278 Ga. at 634 (punctuation omitted). As support for that proposition, we cited Hess v. Port Authority Trans-Hudson Corp., 513 U. S. 30 (115 SCt 394, 130 LE2d 245) (1994), and to be sure, Hess says just that. See 513 U. S. at 51 (III). But Hess involved an instrumentality created not by a single state, but rather, born of an interstate compact ratified by Congress. The United States Supreme Court explained in Hess that, "[w]hen indicators of immunity point in different directions, the Eleventh Amendment's *twin* reasons for being remain our prime guide," id. at 47 (III) (emphasis supplied), namely, the protection of state treasuries *and* the preservation of the respect and dignity due the states as sovereigns. See id. at 39-40 (II). Because the instrumentality at issue was born of an interstate compact, the dignity interest simply was not implicated in Hess: "Suit in federal court is not an

18

affront to the dignity of a Compact Clause entity, for the federal court, in relation to such an enterprise, is hardly the instrument of a distant, disconnected sovereign; rather, the federal court is ordained by one of the entity's founders." Id. at 41 (II). The Supreme Court identified the financial dependency factor as the most important factor in Hess only after deeming the dignity interest irrelevant on the facts of that case. And we note that in other cases, the United States Supreme Court has emphasized the dignity interest as the "central purpose" of the constitutional preservation of sovereign immunity. See, e.g., Federal Maritime Comm. v. South Carolina State Ports Authority, 535 U. S. 743, 765 (III) (D) (2) (122 SCt 1864, 152 LE2d 962) (2002) ("While state sovereign immunity serves the important function of shielding state treasuries and thus preserving the States' ability to govern in accordance with the will of their citizens, the doctrine's central purpose is to accord the States the respect owed them as joint sovereigns." (Citations and punctuation omitted)). Hines seems to have put too much emphasis on the last of the three factors.

Our most serious concern with Hines, however, is the undeveloped factual record upon which that decision was based. Hines came before the Court on an interlocutory appeal from the denial of a motion to dismiss and without an

19

evidentiary record, a limitation that we acknowledged expressly in our opinion. See 278 Ga. at 636 n.32. The absence of a developed factual record left us with only the law from which to gauge whether the Ports Authority is an "arm of the state," notwithstanding the direction of the United States Supreme Court to examine the circumstances of an instrumentality "both legally and practically." Hess, 513 U. S. at 51 (III). Our inability to discern the relationship between the Ports Authority and the State in practice inhibited our assessment of whether the Ports Authority is an "arm of the state."

The more substantially developed factual record in this case confirms that we were left in Hines with a distorted view of the Ports Authority and its relationship with the State. In Hines, we characterized the Ports Authority as financially "self-sufficient," 278 Ga. at 636, but in this case, the trial court found that the Ports Authority "could not provide, from its revenues alone, the necessary facilities and operational capability to carry out its statutory responsibility to provide for public docks and waterways." In Hines, we distinguished Ristow v. South Carolina Ports Authority, 58 F3d 1051 (4th Cir. 1995), on the ground that the instrumentality at issue in Ristow "was not self-sufficient because its extensive capital improvements were paid for with bonds

20

that were wholly repaid from general tax revenues." Hines, 278 Ga. at 635-636.

In this case, on the other hand, the trial court found that the Ports Authority

depends in large part upon the State to fund capital improvements with general

obligation bonds, which are repaid principally from the state treasury with

general tax revenues. Similarly, in Hines, we concluded that the State does not

control the Ports Authority to an extent that points toward immunity. See id. at

636-637. But in this case, the trial court found that the State exercises an

"exacting level of control" over the Ports Authority.

The shortcomings of our analysis in Hines leave us convinced that Hines

is unsound, but it does not inevitably follow that Hines ought to be set aside.

After all, we generally "adhere to the principle of stare decisis, which directs the

courts to stand by their prior decisions." Smith v. State, 295 Ga. 120, 121 (757

SE2d 865) (2014). Even so, we recognize that "stare decisis is not an inexorable

command," State v. Jackson, 287 Ga. 646, 658 (5) (697 SE2d 757) (2010), and

"sometimes, there are compelling reasons to reexamine an earlier decision."

Smith, 295 Ga. at 122. To decide whether a precedent ought to be set aside, we

consider the soundness of its reasoning, to be sure — it is, we have said, the

most important factor — but we also consider "the age of the precedent, the

reliance interests involved, [and] the workability of the prior decision." State v.

Hudson, 293 Ga. 656, 661 (748 SE2d 910) (2013). See also Olevik v. State, 302

Ga. 228, 244-245 (2) (c) (iv) (806 SE2d 505) (2017). In addition, we "consider

the ease with which the People and their elected representatives might overrule

our precedents, if they think them incorrect." Lejeune v. McLaughlin, 296 Ga.

291, 298 (2) (766 SE2d 803) (2014).

None of the other considerations demands that Hines be retained as a

precedent. Hines is "neither ancient nor entrenched in Georgia law," Willis v.

State, 304 Ga. 686, 705 (820 SE2d 640) (2018) (citation and punctuation

omitted), and other than the decision of the Court of Appeals in this case, we

find no published decisions that rely on Hines for the proposition that the Ports

Authority is not an "arm of the state" for purposes of sovereign immunity. Hines

does not implicate property or contract rights, and we see no reliance interests

that would cut against an overruling of Hines. See Jackson, 287 Ga. at 658 (5).

Hines is perfectly workable, but the alternative is no less so. And inasmuch as

Hines misstates several important principles of federal constitutional law, and

its ultimate holding — that the Ports Authority is not an "arm of the state" for

purposes of "Eleventh Amendment immunity" — is one of federal constitutional

22

law, it is a decision that is not susceptible of correction by anyone other than this Court or the United States Supreme Court. The unsoundness of Hines cuts most strongly against its retention as a precedent, and in the absence of compelling reasons to retain it, we overrule Hines.

4. As we explained earlier, we have no reason to quarrel with the Vierling standard, and we again adopt it as the standard by which to assess whether a state instrumentality is an "arm of the state" for purposes of sovereign immunity. We now will proceed to assess the relationship between the State and the Ports Authority — as shown by the record in this case — under that standard. We will consider each of the three factors in the order in which it appears in the Vierling articulation of the standard.

(a) *How State Law Characterizes the Ports Authority*

Established by the Georgia Ports Authority Act of 1945, see Ga. L. 1945, p. 464, the Ports Authority is deemed an "instrumentality of the State of Georgia and a public corporation" by state law. OCGA § 52-2-4. The General Assembly has declared "that the creation of the [Ports Authority] and the carrying out of its corporate purpose is in all respects for the benefit of the people of this state and is a public purpose and that the [Ports Authority] will be performing an

23

essential governmental function in the exercise of the power conferred upon it." OCGA § 52-2-37. Georgia law clothes the Ports Authority with certain prerogatives, obligations, and privileges that suggest that it functions as an arm of the State, including: the power to acquire real property or rights of easement by "condemnation of property for public use," OCGA § 52-2-9 (3); the obligation to "develop and improve the harbors or seaports of this state for the handling of waterborne commerce from and to any part of this state and other states and foreign countries," OCGA § 52-2-9 (16); the duty to "foster and stimulate the shipment of freight and commerce through such ports, whether originating within or without this state, including the investigation and handling of matters pertaining to all transportation rates and rate structures affecting the same," OCGA § 52-2-9 (18); the power to "do any other things necessary or proper to foster or encourage the commerce, domestic or foreign, of the state, of the United States of America, or of the several sister states," OCGA § 52-2-9 (21); the authority to employ peace officers having the power of arrest, OCGA § 52-2-10; and an exemption from state income and state and local property taxes, OCGA § 52-2-37. Moreover, Georgia law treats the Ports Authority not only as an "agenc[y]" of the State for the purposes of the sovereign immunity

24

reserved to the State and its departments and agencies under the Georgia Constitution, see Miller, 266 Ga. at 587, but the Ports Authority is a part of the "State" as that term is used in the Tort Claims Act. See id. at 588-589.[7] The Ports Authority appears to come within the scope of the Open Meetings Act, see OCGA § 50-14-1 (a) (1) (A), the Open Records Act, see OCGA § 50-18-70 (b) (1), and the Georgia Records Act, see OCGA § 50-18-91 (1). In addition, Georgia law considers the Ports Authority an "arm of the State" against which punitive damages cannot be awarded. See Georgia Ports Authority v. Hutchinson, 209 Ga. App. 726, 730 (13) (a) (434 SE2d 791) (1993).

(b) *The Extent to Which the State Controls the Ports Authority*

The record shows that the State has significant control over the Ports Authority, both in a formal sense and in practice. The Governor appoints all members of the Ports Authority board, see OCGA § 52-2-5 (a), and the director of the Office of Planning and Budget (or some other designee of the Governor) sits on the board ex officio. See OCGA § 52-2-5 (b). The Attorney General is the principal legal counsel to the Ports Authority and is "vested with complete

---

[7] As used in the Tort Claims Act, "State" does *not* include "counties, municipalities, school districts, other units of local government, hospital authorities, or housing and other local authorities." OCGA § 50-21-22 (5).

and exclusive authority and jurisdiction in all matters of law relating to [the Ports Authority]." OCGA § 45-15-14. See also OCGA § 45-15-13. Although the Ports Authority is authorized to incur debt, it may do so only with the approval of the State Financing and Investment Commission, see OCGA § 50-17-22 (f) (1), of which the Governor serves as chair. See OCGA § 50-17-22 (b) (1). The Ports Authority can sell or lease its real property, but only with the approval of the Governor, the Attorney General, and the State Auditor. See OCGA § 52-2-11 (2). The Ports Authority can purchase real property, but only with the approval of the State Properties Commission, see OCGA § 52-2-13, of which the Governor serves as chair. See OCGA § 50-16-32 (b). Upon demand, the Ports Authority is required to produce "all of [its] books, records, accounts, vouchers, warrants, bills, and other papers dealing with or reflecting upon the financial transactions and management of [the Ports Authority]" to the State Auditor. OCGA § 50-6-7. All of these circumstances tend to suggest that the State has considerable control over the Ports Authority. We acknowledge that members of the Ports Authority board are appointed for fixed terms, that the Ports Authority board elects its own chair and vice chair, and that the Ports

26

Authority establishes its own rules and regulations, see Hines, 278 Ga. at 636, which muddies the waters a bit.

But in practice, as the trial court found, the State exercises an "exacting level of control" over the Ports Authority. The record shows that the executive director of the Ports Authority "is in weekly, if not more frequent, contact with the Governor's office to discuss the operations of the [Ports] Authority and how it can further carry out its statutory mission." The Ports Authority annually submits its budget for review by the Office of Planning and Budget. The Governor has furloughed employees of the Ports Authority by executive order. And on at least one occasion, the State directed the Ports Authority to deposit $10 million in the state treasury to cover a shortfall in tax revenues and help to balance the state budget, and the Ports Authority complied with that directive, notwithstanding that it had no legal obligation to do so. The trial court found the latter occurrence "very persuasive" on the question of control, and we do too. The totality of the record shows that the State exercises considerable control over the Ports Authority.

(c) *The Extent of State Financial Support and Responsibility for the Ports Authority*

The record in this case shows that the State provides extensive financial support to the Ports Authority. Although the Ports Authority generates its own substantial revenues and has the authority to issue its own revenue bonds (subject to the approval of the State Financing and Investment Commission), see OCGA § 52-2-15, the trial court found that the Ports Authority's major capital projects are funded in large part by the State through general obligation bonds, which are repaid from the state treasury with general tax revenues, and without that funding, the Ports Authority "could not provide, from its revenues alone, the necessary facilities and operational capability to carry out its statutory responsibility to provide for public docks and waterways." The Ports Authority, the trial court concluded, is not "self-sufficient." Cf. Ristow, 58 F3d at 1053-1054.

Likewise, although the State may have limited formal responsibility for the liabilities of the Ports Authority, the record shows nonetheless that judgments against the Ports Authority may practically impact the state treasury. The Department of Administrative Services administers the Georgia Tort Claims Trust Fund, which pays up to $1 million to satisfy judgments against various state instrumentalities under the Tort Claims Act, and the Georgia General

28

Liability Fund, which pays to satisfy judgments for tort liabilities beyond the auspices of the Tort Claims Act. Although the Ports Authority pays into each of these self-insurance funds, so do numerous other state instrumentalities, and the self-insurance funds spread risk among the participating instrumentalities. Moreover, Georgia law authorizes the appropriation of state funds to support the self-insurance funds. See OCGA § 50-5-16 (b). To the extent that state appropriations are put directly into the self-insurance funds, or to the extent that the risk is spread among other instrumentalities that depend on state appropriations, draws upon the self-insurance funds certainly could impact the state treasury. Moreover, to the extent that a judgment against the Ports Authority were to exceed its coverage under the self-insurance funds and excess liability policies,[8] satisfaction of the judgment conceivably could — in an extreme case, to be sure — substantially deplete or even exhaust the Ports

---

[8] In addition to these self-insurance funds, the Department and the Ports Authority each maintains excess liability coverage through a third-party insurer for the benefit of the Ports Authority, although the existence of that insurance coverage is not determinative of whether the Ports Authority is an arm of the state. See Regents of the Univ. of Cal. v. Doe, 519 U. S. 425, 431 (II) (117 SCt 900, 137 LE2d 55) (1997) ("[N]one of the reasoning in our opinions lends support to the notion that the presence or absence of a third party's undertaking to indemnify the agency should determine whether it is the kind of entity that should be treated as an arm of the State.").

Authority's funds, and in that circumstance, the State would ultimately have to choose between increasing its appropriation to make up the shortfall or allowing the statutory duties of the Ports Authority to go unfulfilled. Cf. United States ex rel. Lesinski v. South Fla. Water Mgmt. Dist., 739 F3d 598, 605 (IV) (D) (11th Cir. 2014). The idea that the State would make up the shortfall is hardly a fanciful one, inasmuch as the record shows that the State "provides, out of its own funds, whatever economic support is necessary over and above the [Ports] Authority's net revenues to ensure the continued vitality of the [Ports] Authority."

(d) A consideration of these factors leads us to conclude that the Ports Authority is an "arm of the state" for purposes of the Eleventh Amendment. See, e.g., Ross v. Jefferson County Dept. of Health, 701 F3d 655, 658-661 (III) (A) (11th Cir. 2012). We note that our conclusion is consistent with Misener Marine Constr., Inc. v. Norfolk Dredging Co., 2008 WL 2278132 (S.D. Ga. Mar. 28, 2008), a case in which the United States District Court for the Southern District of Georgia determined — on a factual record that was more robust than the record in Hines but appears to have been less substantial than the record in this case — that the Ports Authority is an "arm of the state" entitled to immunity

30

under the Eleventh Amendment. See also <u>Cobb v. Georgia Ports Authority</u>, 2015 WL 5001548 (S.D. Ga. Aug. 21, 2015) (following <u>Misener</u> and concluding that the Ports Authority enjoys immunity under the Eleventh Amendment).

5. Because the Ports Authority is an "arm of the state" entitled to immunity under the Eleventh Amendment from suit in federal court, it follows that the sovereign immunity from suit in state court that is reserved to the Ports Authority under the Georgia Constitution is not susceptible of abrogation by federal maritime law. Accordingly, the doctrine of sovereign immunity bars a lawsuit in state court against the Ports Authority to recover damages for the tort of its employee, except to the extent that the State has consented to the suit. By the terms of the Tort Claims Act, the State has consented to such a suit, but only to the extent that the damages do not exceed $1 million. The motion to dismiss Lawyer's claim for damages in excess of $1 million should be granted, and the judgment of the Court of Appeals is reversed.

<u>Judgment reversed.</u> Melton, C. J., Nahmias, P. J., Benham, Boggs, JJ., Judge John M. Ott, and Judge Sheryl B. Jolly concur. Hunstein, J., concurs in judgment only. Peterson, J., not participating. Warren and Bethel, JJ., disqualified.

Decided November 1, 2018 — Reconsideration denied November 15, 2018.

Certiorari to the Court of Appeals of Georgia — 342 Ga. App. 161.

Christopher M. Carr, Attorney General, Kathleen M. Pacious, Deputy Attorney General, Loretta L. Pinkston-Pope, Ronald S. Boyter, Jr., Senior Assistant Attorneys General, Jared M. Campbell, Assistant Attorney General; Sarah Hawkins Warren, Solicitor-General, Andrew A. Pinson, Deputy Solicitor-General, for appellant.

Savage, Turner & Pinckney, Brent J. Savage, Brent J. Savage, Jr., Kathryn H. Pinckney, for appellee.